Docket No. 107146.

IN THE

**SUPREME COURT**

**OF**

**THE STATE OF ILLINOIS**

---

JERRY SLOVINSKI, Appellant, v. JAMES ELLIOT *et al.,* Appellees.

*Opinion filed April 15, 2010.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Garman, and Karmeier concurred in the judgment and opinion.

Justice Kilbride dissented, with opinion.

**OPINION**

Following the entry of a default judgment in a defamation lawsuit, a jury awarded the plaintiff, Jerry Slovinski, $81,600 in damages for emotional distress and $2 million in punitive damages. The circuit court of Cook County remitted the punitive damage award to $1 million. On appeal, the appellate court affirmed the default judgment and the award for emotional damage but remitted the punitive damage award further, to $81,600. No. 1–05–0423 (unpublished order under Supreme Court Rule 23). Plaintiff appeals, challenging only the appellate court's judgment remitting the punitive

-1-

damage award. We affirm the judgment of the appellate court.

## Background

In July 1997, plaintiff filed a one-count complaint alleging defamation *per se* against Cherry Communications, Inc. (Cherry), and its chief executive officer, defendant James Elliot. Cherry was a telecommunications company which bought long-distance phone minutes in bulk at a discounted rate and then resold them for a profit. Plaintiff's cause of action was stayed in November of 1997 after Cherry filed for bankruptcy. Cherry has since dissolved and is no longer a party to this action.

The bankruptcy stay was eventually lifted and, in April of 2003, plaintiff filed a second amended complaint. In his complaint, plaintiff alleged that he was the chief financial officer of Cherry from July 1995 to May 1996. Plaintiff further alleged that one of his responsibilities as chief financial officer was to prepare monthly and annual financial statements, which would allow Cherry's suppliers to assess the financial strength and creditworthiness of the company.

In May 1996, plaintiff's employment was terminated. According to plaintiff's complaint, prior to his departure from Cherry he had completed Cherry's 1995 annual financial statement and the monthly statements for January, February, and March 1996. Plaintiff maintained that the financial statements demonstrated that the overall financial situation of Cherry was worsening.

Several months after his employment was terminated, plaintiff learned of a meeting that occurred in July 1996 between defendant and representatives from WorldCom, one of Cherry's suppliers. During this meeting, defendant and the WorldCom representatives discussed Cherry's debt to WorldCom, and WorldCom requested Cherry's 1995 annual financial statement and updated monthly statements. Plaintiff alleged that, during the meeting, defendant made false statements about plaintiff to the WorldCom representatives. Specifically, according to plaintiff, defendant stated that Cherry's financial statements were not available because plaintiff had not completed them, plaintiff "was not doing his job," plaintiff "came in late and left early," plaintiff was "sneaking off to do workouts," and plaintiff "spent his time chasing pussy all day."

After defendant failed repeatedly to answer discovery requests, the circuit court entered a default judgment against defendant pursuant to Supreme Court Rule 219(c)(v) (210 Ill. 2d R. 219(c)(v)). A hearing was subsequently held before a jury on the question of damages. See 735 ILCS 5/2–1206(a) (West 2000).

At the hearing, plaintiff and his wife, Bonita Slovinski, were the only witnesses to testify. The bulk of plaintiff's testimony consisted of extensive descriptions of his work and salary history after leaving Cherry. Through this testimony, plaintiff attempted to show that defendant's defamatory statements had damaged his reputation in the telecommunications industry and resulted in a reduction in his income. Plaintiff also testified that defendant's defamatory statements caused him emotional distress. Plaintiff stated that he had a "very difficult conversation" with his wife about the defamatory statements and had to explain to her that they were not true. Plaintiff also testified that, because his professional reputation had suffered, he had been forced to take jobs out of town and had lost time with his family. Finally, plaintiff stated that he had not yet told his children about the statements, that this was something else he had to do, and that this was something that caused him emotional stress. On cross-examination, plaintiff acknowledged that his firing, which occurred some two months prior to defendant's meeting with the WorldCom representatives, was unrelated to defendant's defamatory statements.

Bonita testified that she was "shocked" to learn of defendant's accusation that plaintiff had chased "women all day long." She initially considered whether the accusation was true but "after thinking about it" realized it "was definitely a false accusation." According to Bonita, plaintiff appeared less "energetic about going to work" after he learned about the defamatory statements. He also spent less time socializing with friends.

The evidence presented at the hearing regarding defendant's conduct was minimal.[1] Plaintiff testified that he received a phone call

---

[1]Although plaintiff's complaint contained further allegations regarding defendant's defamatory statements, and these were deemed admitted by virtue of defendant's default, the allegations were not presented to the jury during the damages hearing. See generally *Mooney v. Underwriters at*

from the treasurer of WorldCom in November of 1996. According to plaintiff, the treasurer told him that during a meeting with WorldCom representatives in July 1996, defendant made a number of disparaging comments about plaintiff. Specifically, defendant told the WorldCom representatives that plaintiff had not completed Cherry's financial statements, that plaintiff "was not doing his job," that plaintiff "came in late and left early," that plaintiff was "sneaking off to do workouts," and that plaintiff "spent his time chasing pussy all day." Plaintiff testified that none of these statements were true. No further evidence was introduced regarding defendant's conduct and no evidence was introduced regarding defendant's finances.

During closing argument, plaintiff's attorney contended that an award of $2 million in punitive damages was necessary to punish defendant, largely because defendant had engaged in a premeditated scheme to harm plaintiff. Defendant's counsel, in turn, declined to address the issue of punitive damages. Instead, defense counsel argued to the jury that since punitive damages could only be awarded if compensatory damages were found, and since, in defense counsel's view, there was no basis for a compensatory award, there was no need to even discuss the issue of punitive damages.

The jury subsequently returned an itemized verdict form awarding plaintiff $0 for lost wages, $0 for damage to reputation, $81,600 in damages for emotional distress and $2 million in punitive damages. The circuit court denied defendant's posttrial motion seeking judgment notwithstanding the verdict, a directed verdict or a new trial. The court also denied defendant's motion seeking remittitur of the compensatory damage award. However, the circuit court granted defendant's motion seeking remittitur of the punitive damage award and reduced the award to $1 million. Defendant appealed. Plaintiff cross-appealed, challenging the circuit court's reduction of the punitive damage award.

The appellate court affirmed the trial court's entry of the default judgment and upheld the award of $81,600 for emotional distress.

---

*Lloyd's, London*, 33 Ill. 2d 566, 570 (1965) (admissions in pleadings may be argued to the jury); 4 J. Wigmore, Evidence §1064 (Chadbourn rev. ed. 1972).

However, the appellate court entered a remittitur of $1,918,400 on the punitive damage award, reducing it to $81,600, conditioned on plaintiff's consent. No. 1–05–0423 (unpublished order under Supreme Court Rule 23). We granted plaintiff's petition for leave to appeal. 210 Ill. 2d R. 315. We also allowed the Illinois Trial Lawyers Association to file an *amicus curiae* brief in support of plaintiff.

Analysis

Punitive damages "are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future." *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990). Punitive damages may be awarded when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is "committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978). To determine whether punitive damages are appropriate, "the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant." Restatement (Second) of Torts §908(2) (1979). Because punitive damages are penal in nature, they "are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Kelsay*, 74 Ill. 2d at 188.

Section 2–1207 of the Code of Civil Procedure (735 ILCS 5/2–1207 (West 2000)) provides that the "trial court may, in its discretion, with respect to punitive damages, determine whether a jury award for punitive damages is excessive, and if so, enter a remittitur and a conditional new trial." Accordingly, when, as in this case, a circuit court reduces a jury's punitive damage award by remittitur, we review the court's decision for an abuse of discretion.

Initially, plaintiff contends that the appellate court erred in not reinstating the jury's original award because the jury's award of $2 million should have been left undisturbed by the circuit court. In plaintiff's view, the circuit court abused its discretion in remitting the

jury's punitive damage award by any amount.

In granting defendant's motion for remittitur, the circuit court first recited the general principles underlying punitive damages, stating that such damages are meant to punish the wrongdoer and deter others, and that punitive damages must "fit the crime" and not be imposed unwisely. The circuit court then went on to note that while it did not condone defendant's conduct,

> "an award which is disproportionate to the wrong serves none of the purposes of punitive damages and is excessive. The Court believes that in light of the fact that the jury awarded Plaintiff $81,600.00 compensatory, an award of punitive damages in the amount of one million dollars is sufficient to punish the Defendants and deter others from committing a similar offense. Accordingly, a remittitur will be entered in the amount of one million dollars."

Plaintiff maintains that this reasoning is inadequate. According to plaintiff, the circuit court erred in entering a remittitur without first making specific findings that the evidence failed to support the jury's award, or that the jury's award was improperly based on passion, prejudice or corruption. Citing to *NC Illinois Trust Co. v. First Illini Bancorp, Inc.*, 323 Ill. App. 3d 254 (2001), plaintiff maintains that the circuit court's failure to make these specific findings is, by itself, reason to hold that the court abused its discretion and is reason to reinstate the jury's award. We disagree.

In *NC Illinois Trust Co.*, the appellate court reversed a circuit court's remittitur of a jury's punitive damage award. In so holding, the appellate court stated the following:

> "In remitting the jury's punitive damages award to $450,000, the trial court here made no specific findings nor did it determine that the jury verdict was the product of passion or prejudice. Instead, the court stated only that it found the damages award to be excessive.
>
> This court has already set forth with particularity the evidence in the record supporting the jury's finding that Bank repeatedly breached its fiduciary duty to the estate. Because the trial court indicated only that it did not believe the evidence supported the verdict, this court has no way to

-6-

review the propriety of that decision. Case law dictates that when *the record supports the jury verdict*, the trial court must set forth its reasons for remitting that award. See *Batterton*, 105 Ill. App. 3d at 805, 434 N.E.2d at 1178. As the court here failed to do so, we reverse." (Emphasis added.) *NC Illinois Trust Co.*, 323 Ill. App. 3d at 267.

Though it was perhaps inartfully phrased, we do not read *NC Illinois Trust Co.* as holding that a circuit court's failure to provide specific reasons for entering a remittitur is, standing alone, and without giving any consideration to the record, a basis for a reviewing court to hold that the circuit court abused its discretion. Rather, we read *NC Illinois Trust Co.* as standing for the simple principle that when a reviewing court determines that the record supports the jury's verdict, and the circuit court offers no explanation as to why a remittitur is necessary, the jury verdict must be reinstated.

This reading of *NC Illinois Trust Co.* is consistent with the standard of review that we have recognized for a circuit court's ruling on a motion for new trial, a motion closely related to remittitur. See, *e.g.*, *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 254 (2006). As we have held, when reviewing a circuit court's ruling on a motion for new trial, "an abuse of discretion will be found where there is no recognizable basis in the record to support" the order entered by the circuit court. *Snelson v. Kamm*, 204 Ill. 2d 1, 41 (2003). Applying that standard here, the relevant question for the appellate court was not whether the circuit court set forth any particular findings. Instead, the question faced by the appellate court was whether or not there was a basis in the record to support the circuit court's order.

Plaintiff further contends, however, that the appellate court also erred when it failed to offer more specific reasons for its holding that the circuit court should have reduced the punitive damage award further. The appellate court below, after acknowledging that the circuit court's entry of a remittitur was reviewed for an abuse of discretion, stated the following:

"Here, after carefully reviewing the evidence, we conclude that defendant's conduct was reprehensible and certainly warrants an award of punitive damages. Nevertheless, we find that both the jury's $2 million punitive damages award and the

circuit court's order of remittance to $1 million represent excessive awards. *** Ultimately, we conclude that a punitive damages award of $81,600, which is equal to plaintiff's compensatory damages award, would sufficiently punish defendant and deter others from committing a similar offense under the particular circumstances of this case." No. 1–05–0423 (unpublished order under Supreme Court Rule 23).

Plaintiff contends that the appellate court's statement that it reviewed the evidence is insufficient and that the appellate court was required to state with more specificity how the circuit court erred. The appellate court's failure to do so, according to plaintiff, means that we must reverse the judgment of the appellate court. Again, we disagree.

"It is a fundamental principle of appellate law that when an appeal is taken from a judgment of a lower court, '[t]he question before [the] reviewing court is the correctness of the result reached by the lower court and not the correctness of the reasoning upon which that result was reached.' " *People v. Johnson*, 208 Ill. 2d 118, 128 (2003), quoting *People v. Novak*, 163 Ill. 2d 93, 101 (1994). For purposes of our review, it is irrelevant whether the appellate court articulated with sufficient clarity the reasons it had for reaching its decision. The issue for this court is simply whether the appellate court erred in holding that the circuit court should have reduced the jury's award further.

In order to determine whether the appellate court erred, we must of course resolve the underlying issue of whether the circuit court was correct to enter a remittitur in the first place. Accordingly, we conclude that the scope of our review in this case may be expressed in a single question: Is there a basis in the record to support the remittitur entered by the circuit court? We turn now to that question.

The primary argument advanced by plaintiff in the circuit court in favor of a large punitive damage award was that defendant engaged in a premeditated scheme to harm plaintiff. During closing argument, for example, plaintiff's counsel stated to the jury:

"And I said before how [the defamatory statements] were designed. I keep thinking before [defendant] went into that meeting when he was driving his limo over to WorldCom, he had to have sat in the back seat and thought what can I tell them? What can I tell them that may be believable, that will

-8-

appeal to them about why these financials aren't available? What can I tell them about [plaintiff] that will appeal to the men in the room?

[Defendant's counsel]: Objection, Judge.

THE COURT: Overruled.

[Plaintiff's counsel]: I wonder whether he was frankly really pleased with himself when he came up with the chasing pussy story, because I'm sure that he knew that would appeal to the men in the room, and that that would play well with them. We know he had to think about it. We know he had to plan it out, unless maybe all this comes natural to him."

Later, plaintiff's counsel continued with the theme of premeditation:

"And the defendant is not entitled to the benefit of any doubt because he didn't give [plaintiff] any benefit of the doubt on that day in July of 1996 when he maliciously with malice aforethought went into that meeting and did what he did to [plaintiff] and his family."

Plaintiff also repeats this argument before this court. Plaintiff contends that the jury's original $2 million punitive damage award is justified because defendant's "conduct was premeditated, calculated, and considered in a 'risk-reward' type of framework."

The problem with this argument is that the jury heard absolutely no evidence to support it. There was no evidence that defendant rode in a limousine while plotting to defame plaintiff prior to meeting with the WorldCom representatives. In fact, there was no evidence presented of anything taking place prior to July 1996 that would indicate defendant had a premeditated scheme to defame plaintiff. The only evidence offered of events prior to July 1996 that would appear, at least initially, to bear on the question of defendant's motivation was plaintiff's firing in May of 1996. But plaintiff testified that his firing had nothing to do with defendant's defamatory statements:

"[Defendant's counsel]: But it is your testimony, is it not, Mr. Slovinski, that any comments made that are prayed for in your complaint had nothing to do with your firing in May of 1996?

[Plaintiff]: That is correct."

-9-

As part of his argument that defendant had a premeditated scheme to defame plaintiff, plaintiff's counsel also maintained that defendant's defamatory statements successfully "bought time" for Cherry and helped stave off bankruptcy until November of 1997. But plaintiff testified that after May 1996, he "was gone so I really wasn't involved" with Cherry and thus had no knowledge of Cherry's business transactions. On this record, it is possible that the bankruptcy would have occurred at the same time it did, even if defendant had not made the statements about plaintiff. Accordingly, there was no evidence that defendant's statements delayed Cherry's creditors or was part of a successful, premeditated scheme to "buy time."

Plaintiff's counsel also argued to the jury that the defamatory statements were part of premeditated scheme enacted by defendant because otherwise defendant would have had to invest more of his own money into Cherry. Again, however, no evidence was offered about Cherry's financial status or whether defendant would have been required to put his own money into the firm.

In short, there was no evidence presented to the jury that defendant had an intentional, premeditated scheme to harm plaintiff. The most that may be said on this record–and defendant does not contest this point–is that defendant's defamatory statements were made with a reckless disregard for plaintiff's rights. This places defendant's conduct on the low end of the scale for punitive damages, far below those cases involving a defendant's deliberate attempt to harm another person.

Other facts of record also indicate that a small punitive damage award is appropriate in this case. For example, the evidence before the jury was that defendant did not repeat the defamatory statements, but made them only once, in the July 1996 meeting. The scope of publication was also limited, to those individuals present in the meeting.

Further, the jury's verdict with respect to compensatory damages shows limited harm to plaintiff. The jury found no damages for loss of reputation, or lost wages. Although there was a damage award returned for emotional distress, there was no evidence of any physical harm to plaintiff. There was, for example, no evidence of visits to a doctor or therapist, no evidence that plaintiff missed work, and no evidence of any alteration in plaintiff's normal daily activities.

An award of punitive damages must be remitted to the extent that there is no material evidence to support it. *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 426 (1990); see generally C. McCormick, Damages §79, at 281-82 (1935) (observing that even in cases of defamation *per se*, the malicious conduct necessary to support an award of punitive damages may not be presumed, but must be proved by competent evidence). For the reasons stated above, we conclude that the circuit court abused its discretion in remitting the jury's punitive damage award to $1 million. There is no basis in the record to support such an award. We conclude, as did the appellate court below, that the highest award the evidence of record may support is $81,600. Accordingly, we affirm the judgment of the appellate court.

In light of our disposition that the judgment of the appellate court must be affirmed under principles of state common law, we need not address defendant's alternative contention that the circuit court's judgment violated the due process principles set forth in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 155 L. Ed. 2d 585, 123 S. Ct. 1513 (2003), and that the judgment of the appellate court should therefore be affirmed as a matter of federal constitutional law.

Conclusion

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Appellate court judgment affirmed.*

JUSTICE KILBRIDE, dissenting:

I disagree with the majority's conclusion that the trial court abused its discretion in remitting the jury's punitive damage award to $1 million and that the highest award the evidence of record may support is $81,600. In my view, the majority gives lip service to the correct standard of review–whether the trial court abused its discretion in remitting the damages award–and then ignores this standard by substituting its judgment for the trial court's.

-11-

This court has recognized that "[a] reviewing court will not disturb an award of punitive damages on grounds that the amount is excessive unless it is apparent that the award is the result of passion, partiality, or corruption." *Deal v. Byford*, 127 Ill. 2d 192, 204 (1989). Here, by reducing the punitive damages award, the trial court implicitly found that the punitive damage award of $2 million was the result of jury passion, partiality, or corruption. The trial court found the award disproportionate to the wrong and concluded an award of punitive damages in the amount of $1 million was sufficient to punish defendant and deter others from committing a similar offense.

We may only find the trial court's remittitur to be an abuse of discretion when "no reasonable person would agree with the position adopted by the trial court." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997). In reviewing an award of punitive damages, the court is to consider the relevant circumstances, including "the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant." *Deal*, 127 Ill. 2d at 204. In this case, the nature and enormity of the wrong and the liability of defendant are beyond question. In addition, the absence of evidence regarding defendant's financial status is the direct result of defendant's default and may not properly be used against the plaintiff.

The only real issue is the amount of the punitive damages award. Importantly, proportionality between punitive and compensatory damages is not required under this court's precedents. *Deal*, 127 Ill. 2d at 204. "Because punitive damages serve a penal purpose and are awarded not as compensation, but for reasons of retribution and deterrence, the amount of such an award is determined by more than just a consideration of the nature and extent of the claimant's loss." *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 416 (1990). The facts of each case must be examined carefully, and the court must consider the underlying purposes of a punitive damage award. *Deal*, 127 Ill. 2d at 204.

Here, the record indicates that plaintiff filed a complaint alleging defamation *per se*. In his complaint, plaintiff alleged that defendant knowingly made false statements that plaintiff had not completed company financial statements, that plaintiff "was not doing his job," that plaintiff "came in late and left early," that plaintiff "was sneaking off to do workouts," and that plaintiff "spent his time chasing

-12-

[women[2]] all day."

Defendant failed to answer plaintiff's complaint, failed six times to present himself for deposition, and failed to comply with plaintiff's discovery requests, despite being ordered to comply by the trial court. Ultimately, the trial court entered a default judgment against defendant, and the case was set for jury trial on the damages issue alone. Due to defendant's default, we must accept the truth of the allegations in the plaintiff's complaint and conclude that defendant *per se* defamed plaintiff. See *Buck v. Citizens' Coal Mining Co*., 254 Ill. 198, 200 (1912).

According to the allegations in the complaint, defendant maliciously, intentionally, and knowingly made false statements to third parties that were designed to injure plaintiff. The complaint alleged that "defendant knew this statement to be false and the statement was made with the intent to injure plaintiff." The majority's analysis, however, fails to acknowledge the truth of these allegations and, instead, concludes that defendant's conduct merely showed "a reckless disregard for plaintiff's rights," placing "defendant's conduct on the low end of the scale for punitive damages, far below those cases involving a defendant's deliberate attempt to harm another person." Slip op. at 11. The majority does not dispute, however, that the jury was presented with sufficient evidence to warrant punitive damages.

Rather, the majority simply chooses to overlook the truth of the allegations in the complaint and, accordingly, disagrees with the trial court's assessment of the excessiveness of the punitive damage award. The majority apparently would award a significantly lower sum if it were initially deciding the remittitur issue. That, however, is not the role of a reviewing court under the limited "abuse of discretion" standard of review applicable in this case. Because I do not believe the majority properly applied this highly deferential standard of review to the facts we must accept as true under the undisputed allegations in the plaintiff's complaint, I must respectfully dissent.

---

[2] The record establishes that defendant's actual statement was far more derogatory.