# Illinois Official Reports

## Appellate Court

---

### *Mook v. Johnson*, 2018 IL App (3d) 170229

---

| | |
|---|---|
| Appellate Court Caption | SUZETTE R. MOOK and RACHEL M. TRAVELSTEAD, as Independent Executor of the Estate of Jeremy S. Travelstead, Plaintiffs-Appellants, v. ROBIN R. JOHNSON and JAMY C. JOHNSON, Defendants-Appellees. |
| District & No. | Third District<br>Docket No. 3-17-0229 |
| Filed | March 27, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Kankakee County, No. 11-L-158; the Hon. Michael D. Kramer, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Alan F. Smietanski, of Bradley, for appellants.<br><br>Robert A. Regas, of Regas, Gubbins, and Regas, of Kankakee, for appellees. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Justices Lytton and Wright concurred in the judgment and opinion. |

¶ 1 Plaintiffs, Suzette R. Mook and Rachel M. Travelstead, as independent executor of the estate of Jeremy S. Travelstead, filed suit against defendants, Robin R. Johnson and Jamy C. Johnson, alleging that defendants committed fraud by fraudulently concealing the surrender of a life insurance policy. As a result of surrendering the policy, the insurance company issued a check payable to the seven co-owners of the policy in the amount of $612,542.81. After forging at least one of the plaintiffs' signatures and cashing the check, defendants unevenly distributed the funds, keeping $317,440.93 for themselves while distributing $295,101.88 to the other five beneficiaries under the policy. Following a trial, the jury returned a verdict in favor of both plaintiffs and against each defendant awarding both compensatory and punitive damages. Specifically, the jury awarded (1) Mook a total of $44,960.56 in compensatory damages ($22,480.28 against each defendant) and $254,491.44 in punitive damages ($127,519.72 against each defendant) and (2) Jeremy's estate a total of $65,508.56 in compensatory damages ($32,754.28 against each defendant) and $254,491.44 in punitive damages ($127,519.72 against each defendant).

¶ 2 Thereafter, the circuit court of Kankakee County remitted Mook's and Jeremy's estate's punitive damage awards to $20,000 and $10,000, respectively. Plaintiffs appeal the court's judgment remitting their punitive damage awards. We reverse and remand with directions.

¶ 3                                          FACTS

¶ 4 In February 2017, plaintiffs filed an amended two-count complaint against defendants in the circuit court of Kankakee County. The complaint alleged that defendants committed fraud by concealing the surrender of a life insurance policy, insured upon the lives of June R. Lackey and Robert C. Lackey, by (1) forging their signatures on the request for policy surrender form, (2) using the ability to receive the only notice and communication from the life insurance company in order to deceive them, and (3) pursuing a course of conduct designed by artifice and trick to deceive them. Plaintiffs each sought $500,000 in compensatory damages plus statutory interest, $1 million in punitive damages, and attorney fees and costs associated with their suit.

¶ 5                                   I. Undisputed Facts

¶ 6 Jamy is an insurance agent. In August 1999, Jamy sold the life insurance policy at issue, which provided a benefit of $3.5 million upon the death of the last Lackey. Jamy's agency received a commission of $112,000 on the initial sale of the policy. Initially, Lackey's four daughters and three son-in-laws, Aloha M. and Edwin L. Travelstead, defendants Robin R. and Jamy C. Johnson, Brenda G. and David R. Zack, and Suzette R. Mook were the owners of the policy. Pursuant to the policy, upon the death of the last of the insured, the proceeds were payable in one lump sum to the above-named owners, as beneficiaries, *per stirpes*. As of October 21, 2002, the owners and beneficiaries of the policy included defendants, plaintiffs, the Zacks, and Jeremy's sister Shannon Oddera. Jeremy and Shannon replaced their parents on the policy following their deaths. Jamy sent a letter to the insurance company informing it that Robin was the "main owner" of the policy and that all bills and information should be sent to her and any questions directed to him. He did not send this document to any of the other policy owners.

¶ 7    The policy's annual premium, due in August, was $140,000. Each of the seven owners paid the annual premium via a $20,000 gift they received from the Lackeys through the August 2006 payment. Following the August 2006 premium payment, John Lackey announced that he would no longer fund his half of the owners' annual premium payment and, commencing with the August 2007 payment, the owners could either make a loan from the policy against the cash surrender value to pay the premiums or surrender the policy.

¶ 8    In early March 2007, Robin called the insurance company to inquire about surrendering the policy. At that time, the insurance company informed her that all seven policy owners needed to sign the surrender form. The insurance company then followed up with Robin by letter, dated March 9, 2007, indicating that surrendering the policy may not be in her best interest and that other options were available. The letter further noted that if the policy was surrendered that day, the early surrender charges would be $126,000 and its net cash surrender value would be $618,720.30.

¶ 9    On March 20, 2007, Robin submitted a "request for policy surrender form" to the insurance company with only her signature. In an April 2, 2007, letter, the insurance company denied Robin's request to surrender the policy because "[t]he signatures of all [seven co-]owners are required to complete the request." Later that month, Robin submitted additional forms that purportedly bore the signatures of all seven co-owners of the policy. On April 27, 2007, Robin negotiated a check payable to all seven co-owners in the amount of $612,542.81. She distributed those funds as follows:

| $35,000.00 | Robin and Jamy Johnson | Account No. 304-093 |
| $23,403.90 | Robin Johnson | Account No. 139-149 |
| $7,084.76 | Aaron Johnson | Account No. 173-592 |
| $60,000.00 | Robin Johnson | Certificate of Deposit |
| $15,084.76 | Robin Johnson | Account No. 7252 |
| $6,000.00 | Aaron Johnson | Account No. 7250 |
| $45,254.29 | Robin Johnson | Account No. 2128 |
| $9,916.00 | Robin Johnson | Account No. 7252 |
| $30,000.00 | Robin and Jamy Johnson | Account No. 5407 |
| $1,000.00 | Aaron Johnson | Account No. 7250 |
| $25,000.00 | Jeremy Travelstead | Check |
| $25,000.00 | Shannon Odera | Check |
| $24,000.00 | Edwin Travelstead | Check |
| $25,000.00 | Chad Travelstead | Check |
| $90,508.56 | Brenda Zack | Check |
| $90,508.56 | David Zack | Check |
| $15,084.76 | Matt Zack | Check |
| $79,697.22 | Centrue Bank | Check to pay off the balance of a note secured by a mortgage on Robin and Jamy Johnson's home |
| $5,000.00 | Robin Johnson | Cash |

Aaron Johnson is Robin and Jamy Johnson's son. Edwin and Chad Travelstead are Aloha and Edwin L. Travelstead's sons. Matt Zack is Brenda and David Zack's son.

¶ 10    Robert and June Lackey died prior to trial on April 3, 2009, and October 21, 2009, respectively.

¶ 11                                II. Trial Testimony

¶ 12    Robin testified that she did not inform Mook of any alternatives to surrendering the policy prior to submitting the request to surrender forms to the insurance company. Robin gave the surrender form to her mother, June, and she received it back from June with Mook's signature on it. She obtained permission from Jeremy to sign his name on the surrender form after telling him that his grandmother wanted to surrender the policy. Robin could not recall having any conversation with Jeremy regarding alternatives to surrendering the policy.

¶ 13    Jamy testified that he knew more than $300,000 of the $612,542.81 check received as a result of surrendering the life insurance policy was distributed to either himself, Robin, Aaron, or to the bank to pay off the mortgage on their home.

¶ 14    Mook testified that she first became aware that the policy had been surrendered when her sister, Brenda Zack, told her so in May 2008. Mook called the insurance company to report that she had not signed a surrender form. The insurance company then faxed a copy of the surrender forms. Mook denied that the signatures on the surrender form or the subsequent check belonged to her. After Mook spoke with her niece, Shannon Oddera, and found out that she received $25,000, Mook confronted Robin. Within one week of the confrontation, Robin presented Mook with a cashier's check for $45,000 and a check from June for $45,000, which Mook accepted. Mook further testified that the signature on the policy surrender check purporting to be Jeremy's signature did not belong to Jeremy. In addition, neither the check nor the policy surrender form bore Mook's signature.

¶ 15    Jeremy's testimony from his discovery deposition was then read into evidence. Jeremy was Aloha and Edwin L.'s son. He also had two brothers, Chad and Edwin, and a sister, Shannon Odera. He gave Robin permission to sign his name on the surrender form after she told him his grandmother needed his signature. He assumed the money was going to his grandmother. The signature on the back of the surrender check was not his. He was not in the state of Illinois in April 2007 and could not have signed the check. He did not give anyone else permission to sign the check on his behalf. Jeremy received $25,000 from defendants.

¶ 16                    III. Closing Arguments, Jury Instruction, and Verdict

¶ 17    During closing argument, plaintiffs' counsel reiterated that the face value of the policy was $3.5 million. He noted that had the policy been in effect at the time of June's death, each owner would receive $434,000 after deducting for their loans. Counsel sought compensatory damages in the amount of $434,000 and punitive damages in the amount of $868,000 for each plaintiff.

¶ 18    Following arguments, the trial court instructed the jury regarding punitive damages. The court informed the jury that it should consider the following questions when determining the propriety of punitive damages: (1) how reprehensible defendants' conduct was, including (a) the facts and circumstances of their conduct, (b) the financial vulnerability of plaintiffs, (c) the duration of the conduct, (d) the frequency of the conduct, (e) whether defendants attempted to

- 4 -

conceal their misconduct, and (f) whether plaintiffs put their trust in defendants; (2) the actual and potential harm caused by defendants; and (3) the amount of money necessary to punish defendants and deter others from future wrongful conduct.

¶ 19 Thereafter, the jury returned a verdict in plaintiffs' favor. Specifically, the jury awarded (1) Mook a total of $44,960.56 in compensatory damages ($22,480.28 against each defendant) and $254,491.44 in punitive damages ($127,519.72 against each defendant) and (2) Jeremy's estate a total of $65,508.56 in compensatory damages ($32,754.28 against each defendant) and $254,491.44 in punitive damages ($127,519.72 against each defendant).

¶ 20                                      IV. Postjudgment Motions

¶ 21 On March 3, 2017, defendants filed (1) a motion for judgment notwithstanding the verdict, or in the alternative, a motion for a new trial and (2) a motion for remittitur of punitive damages and a motion for stay of judgment. Regarding their motion for remittitur, defendants asserted "the award for punitive damages *** was so excessive that it indicated that the jury was moved by passion and prejudice and the verdict exceeds the necessary limits of flexible limits of fair and reasonable compensation. Further the judgment for punitive damages was so large that it shocks the judicial conscience and should be reduced."

¶ 22 In a written March 30, 2017, order, the trial court denied the motion for judgment notwithstanding the verdict, or in the alternative, a motion for a new trial. However, the court granted the motion for remittitur of punitive damages and for stay of judgment. Following a hearing, the court found that the punitive damage awards were improper and excessive. In the oral pronouncement of its decision, the court stated, in part, as follows:

> "In considering this motion the Court has carefully considered the facts of this case which is a private matter between family members, and there are many factual aspects of this case that would support the defendants' position that to award punitive—punitive damages is improper. Among those facts is the fact that neither defendant signed the name of Suzette Mook on the request for surrender of the policy or on the policy proceeds check. And there is circumstantial evidence that the signature was put there by the mother of Robin Johnson, also the mother of Suzette Mook. There's the circumstantial evidence that Robin Johnson may have been acting on behalf of her mother in *** surrendering the policy and distributing the proceeds in the manner that she did. Plaintiff Travelstead testified that he understood the money involved was his grandparents' money and that his grandparents' could do with it what they wanted. And there was unrebutted testimony that Jeremy Travelstead gave permission for his signature to be added to the policy surrender request.
>
> Now, we are taught as children to honor our parents and to be patient with them when they get older. Robin Johnson may have been simply honoring her mother's wishes in taking the action that she did, but one of those actions was—was to present a document to the insurance company that she knew had a false signature on it, and she presented a check for payment that she knew had a false signature on it, and she and her husband distributed proceeds unequally despite knowing they were joint owners with the other family members. This conduct is wrong no matter what the motivation, though Ms. Johnson was in a difficult position in trying to follow the law with regard to distribution of these proceeds and her mother's wishes. Difficult position, but given that wrong there should be some punishment beyond simple restitution, but that

- 5 -

punishment must be in proportion to the wrongful conduct. [The] Court notes that a conviction for forgery in Illinois carries a jail sentence and may require restitution and a possible maximum fine of $25,000. Plaintiff Suzette Mook testified she presented this case to the State's Attorney and no criminal charges were ever brought against the defendants. As we know the standard of proof in a criminal case is known as beyond a reasonable doubt. A much higher standard than the civil preponderance of the evidence standard.

In this civil case the jury awarded substantial punitive damages that the Court finds were not warranted by the evidence and the jury awarded similar punitive damages—damage amounts to each plaintiff which the Court finds was also not supported by the evidence. The amount of punitive damages appears especially excessive give that the plaintiff's attorney argued for punitive damages equally double the amount of actual damages and the jury went well beyond even the plaintiff's attorney's request for punitive damages."

¶ 23    In sum, the court pointed to what it considered circumstantial evidence that June Lackey forged Mook's signature and that Robin was simply "honoring her mother's wishes" by surrendering the policy and distributing the funds as she did. The court then opined that the punitive damages awarded by the jury were "especially excessive" because (1) a conviction for forgery carries a possible maximum fine of only $25,000 and (2) plaintiffs' attorney only sought punitive damages in an amount double to the amount of compensatory damages. Accordingly, the court remitted Mook's punitive damage award to a total of $20,000 ($10,000 against each defendant) and Jeremy's estate's punitive damage award to a total of $10,000 ($5,000 against each defendant).

¶ 24    Plaintiffs appeal.


¶ 25                                                    ANALYSIS

¶ 26    Plaintiffs assert that the trial court abused its discretion by remitting their respective punitive damage awards.

¶ 27    Punitive damages, unlike compensatory damages, serve to punish the wrongdoer and to deter that party and others from committing similar acts of wrongdoing in the future. *Slovinski v. Elliot*, 237 Ill. 2d 51, 57-58 (2010). "Punitive damages may be awarded when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.' " *Id.* at 58 (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978)). Because punitive damages are penal in nature, courts must take caution to see that they are not improperly or unwisely awarded. *Id.* To that end, a "trial court may, in its discretion, with respect to punitive damages, determine whether a jury award for punitive damages is excessive, and if so, enter a remittitur and a conditional new trial." 735 ILCS 5/2-1207 (West 2016). However, a reviewing court is not free to reweigh the evidence and reduce a jury award merely because it may have arrived at a different verdict. *Snelson v. Kamm*, 204 Ill. 2d 1, 37 (2003). Rather, a jury's punitive damages award should not modified unless it is so excessive that it must have been a result of passion, partiality, or corruption. *Blount v. Stroud*, 395 Ill. App. 3d 8, 22 (2009).

¶ 28    We review a trial court's remittitur of a jury's punitive damages award for an abuse of discretion. *Slovinski*, 237 Ill. 2d at 58. Ultimately, we must determine whether there is a basis in the record to support the trial court's remittitur. *Id.* at 62.

¶ 29    In granting defendants' motion for remittitur and reducing the punitive damages in this case, the trial court essentially reweighed the evidence and then, based on its assessment of the facts, including some irrelevant facts not of record, determined that the punitive damages awarded were excessive. Based on our review of the evidence, we find no basis in the record to support the trial court's remittitur.

¶ 30    In this case, the jury had evidence before it which supports its award of punitive damages. The record shows that reasonable jurors could conclude that the conversion in this case actually started in August 1999, when Jamy sold the policy to his in-laws and received a large commission. Defendants began their quest to commit fraud by concealment against their family members when, as early as October 21, 2002, they attempted to restrict all information pertaining to the policy from the other five owners by asserting that Robin was the "main owner" of the policy and that all billings, information, and questions should be directed to her or Jamy. Approximately 4½ years later, Robin attempted to surrender the policy on her own despite knowing that all policy owners were required to sign the surrender form. After her attempt to surrender was denied, she obtained Jeremy's permission to sign his signature on the surrender form under what the jury could have found to be false pretenses, *i.e.*, by telling Jeremy that his grandmother wanted to surrender the policy. Next, Robin submitted the surrender form knowing that Mook's signature had been forged. Finally, after negotiating the policy proceeds check with Mook's and Jeremy's forged signatures, defendants distributed more than half of the proceeds to themselves and their son and paid off the mortgage on their house, despite the fact that there were five other owners on the policy. Defendants distributed nothing to Mook until she confronted Robin, after which Robin gave her a check for $45,000. In addition, while the jury determined plaintiffs' compensatory damages based on the actual surrender value of the policy, it had evidence before it that had the policy been in effect at the time of June's death, each owner would have received approximately $434,000. Thus, the jury clearly could have found defendants' conduct reprehensible enough and the need for deterrence sufficient to warrant the punitive damages it awarded.

¶ 31    We further note that the punitive damages awarded by the jury were only 5.66 times the amount of Mook's compensatory damages and 3.88 times the amount of Jeremy's estate's compensatory damages. Defendants cite no authority in which a reviewing court reduced punitive damages which were single-digit multipliers on a motion for remittitur, nor did our research discover any. In fact, it appears that punitive damage awards in single-digit multipliers generally comport with due process. For example, in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 425 (2003), the United States Supreme Court declined to impose a bright-line ratio between punitive and compensatory damages but hinted that punitive damages in the single-digit ratio will generally satisfy due process. Specifically, the Court noted that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process"; that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety"; and that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards in

range of 500 to 1, [citation] or, in this case, of 145 to 1." *Id.* Based on the facts of this case, we find the punitive damages awarded by the jury are appropriate.

¶ 32    Moreover, as indicated earlier, the trial court considered facts not in evidence in support of its decision to grant the remittitur in this case. Specifically, the court considered evidence that it heard during previous proceedings but which were deemed inadmissible at trial, including, for example, the fact that the State declined to prosecute defendants criminally or that Robin was merely following her mother's wishes. This was clearly error. Although a trial judge, acting as trier of fact, is presumed to consider only admissible evidence, that presumption is necessarily rebutted where, as here, the record affirmatively shows otherwise. *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962).

¶ 33    Accordingly, we find the trial court abused its discretion in granting the remittitur and reducing the punitive damage awards.

¶ 34                                   CONCLUSION

¶ 35    For the foregoing reasons, we reverse the judgment of circuit court of Kankakee County and remand with directions to enter judgment on the jury award.

¶ 36    Reversed and remanded with directions.