# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530

---

| | |
|---|---|
| Caption in Supreme Court: | KATHLEEN LAWLOR, Appellee, v. NORTH AMERICAN CORPORATION OF ILLINOIS, Appellant. |
| | |
| Docket No. | 112530 |
| | |
| Filed | October 18, 2012 |
| Rehearing denied | January 28, 2013 |
| | |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The tort of intrusion upon seclusion was recognized where an ex-employee sought to hold her former employer vicariously liable after it hired detectives who impersonated her in order to obtain her personal phone records but a punitive damage award was reduced to the amount of compensatory damages. |
| | |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Carol Pearce McCarthy, Judge, presiding. |
| | |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Circuit court judgment affirmed in part, reversed in part, and modified in part. |

| Counsel on Appeal | Eric N. Macey, Steven J. Ciszewski and Julie Johnston-Ahlen, of Novack and Macey LLP, and Michael D. Richman, of Reed Smith LLP, all of Chicago, for appellant. |
| | |
| | Mitchell B. Katten, Nancy A. Temple and Joshua R. Diller, of Katten & Temple, LLP, of Chicago, for appellee. |
| | |
| Justices | JUSTICE THEIS delivered the judgment of the court, with opinion. |
| | Justices Freeman, Thomas, Garman, Karmeier, and Burke concurred in the judgment and opinion. |
| | Chief Justice Kilbride concurred in part and dissented in part, with opinion. |

## OPINION

¶ 1      Plaintiff, Kathleen Lawlor, brought this action in the circuit court of Cook County alleging, *inter alia*, the tort of invasion of privacy by intrusion upon seclusion against her former employer, defendant North American Corporation of Illinois (North American). In a counterclaim, North American alleged, *inter alia*, that Lawlor breached her fiduciary duty of loyalty while an employee. Both parties prevailed in the trial court on their respective claims. Lawlor was awarded $65,000 in compensatory damages and $1.75 million in punitive damages after a jury trial. North American was awarded $78,781 in compensatory damages and $551,467 in punitive damages after a contemporaneous bench trial. The trial court remitted the jury's punitive damages award to $650,000. The appellate court affirmed the jury's verdict on Lawlor's intrusion claim, reinstated the $1.75 million punitive damages award, and reversed the trial court's judgment on North American's breach of fiduciary duty claim. 409 Ill. App. 3d 149.

¶ 2      In this appeal, we are asked to consider whether there was sufficient evidence to support the jury's verdict that North American was vicariously liable for the tortious conduct of investigators on the intrusion claim; whether the jury's award of $1.75 million in punitive damages was excessive and in violation of Illinois common law and federal due process principles; and whether there was sufficient evidence to support the trial court's determination that Lawlor breached her fiduciary duty to North American. For the following reasons, we affirm in part and reverse in part the judgment of the appellate court, and affirm in part, reverse in part, and modify in part the judgment of the circuit court.

¶ 3                             BACKGROUND

¶ 4      The following facts are not in dispute. Lawlor was employed by North American as a

commission-based salesperson from August 1998 until her separation from the company in June 2005. Lawlor worked in North American's graphic services group and primarily sold customized corporate-branded promotional items. Her role was to generate business, after which the day-to-day management of the account was handled by other employees. In August 2005, Lawlor began working for Shamrock Companies, Inc. (Shamrock), a competitor of North American, which sold similar promotional items. Prior to her departure from North American, Lawlor had interviewed for a sales position with Shamrock and communicated with its management.

¶ 5     Shortly after Lawlor left North American, the company began an investigation to determine if she had violated a noncompetition agreement. North American asked its longtime corporate attorney, Lewis Greenblatt, to conduct the investigation, and assigned its vice president of operations, Patrick Dolan, to serve as the company contact person. Greenblatt retained Probe, a private investigation firm which had previously conducted noncompetition investigations. Dolan provided Greenblatt and Albert DiLuigi, Probe's principal, with Lawlor's date of birth, her address, her home and cellular telephone numbers, and her social security number. Probe subsequently used this information when it requested that another investigative entity, Discover, obtain Lawlor's personal phone records. These records included information of the date, time, duration, and numbers called on her home and cell phones for certain periods in 2005. The material obtained by Discover was forwarded to Probe, who faxed the information to North American. Thereafter, some of North American's employees attempted to verify if any of the numbers belonged to one of their customers.

¶ 6     In August 2005, Lawlor filed suit against North American seeking outstanding commissions that she alleged were owed and a declaration concerning the enforceability of the noncompetition agreement. After learning of North American's investigation, she amended her complaint and alleged an intrusion upon seclusion tort based upon a "pretexting scheme" in which someone pretended to be her in order to obtain private phone records without her permission from her telephone carriers. In a counterclaim, North American alleged that Lawlor breached her fiduciary duty of loyalty by attempting to direct business to a competitor while in North American's employ and by communicating confidential corporate sales information to a competitor. North American also sought reimbursement of excess commission draw payments it had made to Lawlor. A six-day trial ultimately ensued on the parties' various claims in September 2009. The relevant evidence adduced at trial concerning North American's involvement in the investigation which led to investigators obtaining phone records, as well as Lawlor's alleged attempt to steer business and disclose confidential sales information to North American's competitors, is summarized below.


¶ 7                    Testimony Relevant to Intrusion Claim

¶ 8     Relevant to Lawlor's intrusion claim, she testified that a few weeks after leaving North American, she suspected that she was being investigated by her former employer. In October 2005, she learned that North American had obtained records concerning her home and cell phones between April and September 2005. Lawlor's home telephone provider at the time

was AT&T, and her cell phone service provider was U.S. Cellular. She testified that she did not request call logs from either company in 2005, nor did she consent to their release. She testified that after learning North American had obtained her phone records, she vomited, experienced anxiety for herself and her family, and had periods of sleeplessness. She further testified that she enhanced the security features on her phone, changed the locks on her home, and installed a security system. Lawlor testified that she had incurred $620,000 in legal fees to two law firms who had represented her in this case and that she had paid $335,000 of that amount. No other evidence was presented concerning her legal fees.

¶ 9       John Miller, North American's chief executive officer and president, testified that he made the decision to investigate Lawlor after she left North American. He asked Greenblatt to be in charge of the investigation and assigned Dolan to be North American's contact person. He was aware that Greenblatt had hired Probe to conduct the investigation. Miller testified that Dolan had the authority to provide Lawlor's personal information from her employee file to obtain phone records. Miller further testified that Dolan showed him a list of handwritten phone numbers in relation to the Lawlor investigation. He reviewed the numbers but did not recognize any of them. He further testified that he assumed North American wanted phone records in connection with the investigation.

¶ 10      Greenblatt testified that he retained Probe to investigate a possible violation of Lawlor's noncompetition agreement. The investigation was for North American's benefit. He testified that he did not have any role in the investigation and he did not limit what Probe could do.[1] Greenblatt testified that he did not have any discussion with Probe concerning investigative techniques and he did not receive any updates or documents to review. He testified that he did not know whether Probe obtained Lawlor's phone records. Greenblatt's law firm paid Probe and was then reimbursed by North American.

¶ 11      DiLuigi testified that he is the president of Probe, a private investigation firm, and that he was hired by Greenblatt to investigate Lawlor. Probe had conducted other noncompetition investigations and had obtained phone records. He testified that Dolan wanted him to obtain Lawlor's phone records. In order to do so, Probe would fill out preprinted forms from Discover and include the name, address, telephone number, date of birth, and social security number of the person whose records he sought. After receiving Lawlor's phone records, he would forward them to Dolan. DiLuigi was subsequently asked by Dolan to try to identify the owner of some of the numbers. The investigation ended around August 2005 when Dolan informed DiLuigi that there was no need to order more records. DiLuigi believed Discover was based in Florida, but that it was no longer in business. No witness from Discover

---

[1]In a pretrial motion opposing Lawlor's request to enforce a subpoena for records pertaining to Probe's investigation, North American represented that Probe and Discover were agents of its attorney. Attached to this motion was an affidavit in which Greenblatt averred that he retained Probe to investigate Lawlor at his direction. He also averred that Probe performed investigatory services as his agent and at his direction concerning the circumstances of Lawlor's employment at North American. The trial court allowed this affidavit to be published to the jury over North American's hearsay objection after mistakenly concluding that Greenblatt had already testified consistent with the representations made in the affidavit.

testified at trial.

¶ 12    Dolan testified that he relied on Greenblatt and DiLuigi in performing the investigation and he did not instruct them on how it should be conducted. He provided Greenblatt and DiLuigi with Lawlor's address, social security number, date of birth and her cell and home phone numbers. Dolan was unaware of what they would do with this information. He testified that he did not request phone logs in this case, but that DiLuigi informed him that he typically obtains such logs in employment noncompetition cases. Dolan received from DiLuigi several faxes which contained hundreds of phone numbers in connection with the Lawlor investigation. He never asked how the phone records were obtained, but he was not surprised to receive them. Dolan conducted Internet searches on some of the phone numbers and consulted with other North American employees to see if they recognized any of the numbers. North American did not pay Probe directly, but Dolan "signed-off" on two separate payments to Greenblatt's law firm for the cost of the investigation.

¶ 13    Todd Van Paris, North American's vice president and general manager, testified that he reviewed faxes with phone numbers from Probe that he assumed were Lawlor's and that he researched some of those numbers on the Internet. Van Paris testified that he was unaware of how Lawlor's phone records were obtained prior to this lawsuit.

¶ 14    Rosemarie Egan, North American's chief financial officer, testified that North American's net worth was approximately $50 million. In April 2006, she approved an invoice to Greenblatt's law firm which included a payment for investigative services provided by Probe.

¶ 15    Roosevelt Boykins, a manager with AT&T, testified that the company would not release any information on a telephone account without first confirming the identity of the customer by asking for the social security number or account number. Similarly, Traci Hart, a subpoena specialist with U.S. Cellular, testified that her company would not release such information on an account if the caller did not provide sufficient information to confirm his or her identity.

¶ 16                Testimony Relevant to Breach of Fiduciary Duty Claim

¶ 17    Relevant to North American's counterclaim, Lawlor testified that Greg Christenson, a former North American colleague, had recruited her to join Shamrock prior to her departure from North American and that she first interviewed with him and other Shamrock executives in November 2004. The following month, she sent Christenson a follow-up letter summarizing her sales history at North American, which provided, in pertinent part:

> "Per our discussion, I will highlight where I currently am as far as total volume.
>
> By year-end, I will have billed $2,000,000 in sales with a [gross profit] of 34%. In addition, Komatsu, which is shared with Jennifer Hall, will be an additional [$]1,600,000 with a [gross profit] of 44%. The $2,000,000 is made up of many accounts to include FTD, Mobil Travel Guide, MapQuest, Vista Management and Pilant as the majors."

¶ 18    Lawlor further testified that in December 2004, she was contacted by Kevin Bristow, an

outside consultant hired by MapQuest to negotiate its print business. MapQuest had previously placed an order with North American and Lawlor had received the commission. Bristow informed her about a new business opportunity with MapQuest which could be significant for North American. She met with Bristow in January and February 2005, but was informed in March 2005 by Mike Perez, her direct supervisor, that the "pitch" would be handled by another employee. In May 2005, she was told that North American intended to have the MapQuest account handled by a salaried employee. In June 2005, Lawlor was informed that North American wanted to change her compensation agreement. She chose not to sign the new agreement and left North American the same month. Lawlor testified that while employed by North American, she never mentioned Shamrock to MapQuest or any of her other customers. After leaving North American, she decided to take the summer off to spend time with her children and began working at Shamrock in September 2005.

¶ 19    Bristow testified that in June 2005, he met with Perez and Van Paris. Bristow was irritated to learn about Lawlor's departure from North American via a third party and the two invited him to their office to discuss the matter. On October 13, 2005, Bristow signed an affidavit prepared by North American concerning his statements at the June meeting which he disavowed at trial.[2] Concerning the execution of the affidavit, Bristow testified that on October 13, 2005, Perez and Van Paris contacted him and related that he needed to sign it immediately. He was on his way to London to see his aunt who was ill, and Perez met him with a notary at an oasis near the airport. Bristow testified that he signed the affidavit despite the fact that the statements contained therein were untrue because he was only concerned about seeing his aunt who died two days later. At trial, he testified that Lawlor did not provide him with any information regarding companies other than North American. Specifically, she never recommended, nor did he consider, involving Shamrock with the MapQuest business.

¶ 20    Perez testified that Bristow had reviewed the affidavit multiple times prior to signing it and that it had been revised based upon his feedback. He responded "yes" to a question of whether the discussion at the June 2005 meeting was consistent with the affidavit. Perez further testified that North American considers its gross profit margin to be confidential information. He claimed that if the company's competitors "knew what our margin was, then they could undercut us and provide those services to our customer." Van Paris also responded "yes" when asked a single question of whether Bristow made statements at the meeting consistent with the affidavit.

---

[2]Bristow's affidavit was admitted into evidence over Lawlor's hearsay objection. The affidavit provided, in pertinent part: (1) between December 2004 and February 2005, Lawlor asked him on several occasions to delay the process of awarding the MapQuest business to North American given the possibility that she might change jobs to Shamrock; (2) Lawlor offered to introduce him, if necessary, to someone at Shamrock who could be his point person until she started to work for them; (3) MapQuest would be better served by Shamrock on the service side rather than North American, who did not care about servicing the account; and (4) he advised Lawlor to proceed cautiously as it was unethical to be pursuing business for one company while still employed by another.

-6-

¶ 21    Jury Verdict and Trial Court Rulings

¶ 22    At the close of Lawlor's case, North American moved for a directed verdict on the intrusion upon seclusion claim. North American asserted, in pertinent part, that in the absence of an agency relationship it could not be held liable for any improper conduct by either Probe or Discover. The trial court denied the motion. North American renewed its motion on the same grounds at the close of all the evidence and the trial court reserved ruling on the motion. The jury subsequently returned a verdict in Lawlor's favor and awarded her $65,000 in compensatory damages and $1.75 million in punitive damages.[3]

¶ 23    The jury answered several special interrogatories establishing, *inter alia*, the following factual findings: (1) Discover obtained information about Lawlor's telephone calls without her authorization through pretexting in that it called her telephone carriers and pretended to be her in order to obtain the information; (2) Probe knew that Discover obtained information about Lawlor's telephone calls without her authorization through pretexting; (3) Probe was acting as North American's agent when it got information about the phone calls from Discover; (4) Discover was acting as Probe's agent when it obtained information about the telephone calls; (5) Probe was acting within the scope of authority granted by North American when information about Lawlor's telephone calls were obtained without her authorization through pretexting; and (6) North American knew that Discover obtained information about Lawlor's phone calls without her authorization through pretexting.

¶ 24    The trial court subsequently entered judgment against Lawlor on North American's breach of fiduciary duty claim. The trial court found that she breached her duty of loyalty by disclosing confidential business information to Shamrock through the Christenson letter and by attempting to steer the MapQuest business from North American to Shamrock. The trial court quoted from portions of the Bristow affidavit in its order. It also found that Bristow's testimony at trial disavowing the affidavit was not credible. The trial court awarded North American $78,781 in compensatory damages and $551,467 in punitive damages.

¶ 25    North American then filed a posttrial motion, requesting that the trial court grant its motion for directed verdict, or enter judgment *n.o.v.*, or order a new trial. North American also asked the trial court to vacate or reduce the amount of the jury's punitive damages award. The trial court denied the posttrial motion, but reduced the punitive damages award from $1.75 million to $650,000. Lawlor also filed a posttrial motion challenging, *inter alia*, the trial court's reliance on the Bristow affidavit as substantive evidence to support North American's counterclaim because it was admitted solely for purposes of impeachment. In denying the motion, the trial court stated that it did not rely on the Bristow affidavit as substantive evidence when concluding that Lawlor had breached her fiduciary duty to North

---

[3]Lawlor and North American were also awarded damages, respectively, in their breach of contract claims. Additionally, the trial court granted North American's motion for a directed verdict on Lawlor's claim that she was entitled to commissions on certain sales made after she left North American. Lawlor had also alleged as part of her intrusion upon seclusion claim that Probe removed items without her permission from her mailbox. The jury rejected the claim. The parties do not raise any issues here regarding those claims.

American.

¶ 26    The trial court provided the following justification, in pertinent part, when reducing the jury's punitive damages award:

> "[I]f you believe all of the agency theory, you have to believe that her records were wrongfully obtained on a number of occasions *** so that is repetitive conduct and it's intentional conduct and it's deceitful conduct. *** The amount of punitive damages shocks the judicial conscience. *** I don't think it passes any of the tests that have been put forward in *** Illinois.
>
> Clearly when this case was argued to the jury, plaintiff argued compensatory damages in the amount of $500,000. *** The plaintiff further argued that punitive damages should be *** ten times compensatory damages, and that is what I'm going to reduce these damages to, exactly what you asked for *** ten times that amount, which is $650,000. ***
>
> I even took into account *** that this was done to protect business by North American. I don't believe that there was any motive to enrich themselves at the expense of Kathy Lawlor. I don't find that she was in a vulnerable position. She left their employ. That was her decision to leave their employ. She decided to take off about six weeks during the summer *** and she immediately went to work for *** Shamrock.
>
> She was a highly paid, sophisticated businesswoman. *** I don't think that she was the victim that she portrayed herself to be, particularly in light of the fact that this case involves wrongful, deceitful conduct by both parties as against each other.
>
> *** I think that the imposition of the amount of punitive damages that this jury gave was a direct result of passion, and the reason I say that is because this jury was considering the conduct of North American as against Kathy Lawlor.
>
> And by any stretch of the imagination, while it was wrongful, while it was intentional, and while it was deceitful and while it occurred more than six times, it was *de minimus*, fairly much, on all criteria.
>
> You know, this is not something that they subjected her to false light. She was not financially vulnerable. This does not go to a public policy, where great numbers of people can be harmed by the conduct in this particular case. It's not a health and safety issue. Her life was not impaired. Her future job was not impaired, but the conduct was, nonetheless, wrongful. And I think that the punitive damage award of $650,000 is a very lot of money in this instance ***.
>
> This Court has the global ability to look at the conduct of both warring parties here to determine what this conduct was and whether or not it was deceitful and reprehensible and how it related one to the other, and that is exactly what I did when I considered the punitive damages that I entered against Kathy Lawlor and in favor of North American. I took this all into consideration because, in truth, Kathy Lawlor hung herself on her own petard.
>
> * * *

*** I really don't have any mechanism to consider legal fees by anybody in this case. There is no legal basis for me to consider that. Beyond that, nobody has offered me any billing statements, any timesheets. I have nothing but unsworn statements by various attorneys in these pleadings[.] ***

* * *

So what you have here, basically, is a case that started out with less than $25,000 worth of dispute on commissions. North American said that they had overpaid her, and she said that she was underpaid. And this ballooned into what we have, and both parties *** won their action against the other.

And Kathy Lawlor has a net gain of $53,542, with all of the setoffs ***."

¶ 27                                    Appellate Court

¶ 28        Both parties appealed. The appellate court affirmed the judgment on the intrusion claim and reinstated the jury's $1.75 million punitive damages award. 409 Ill. App. 3d at 175. The appellate court concluded that Lawlor effectively proved that Probe was acting as North American's agent when Probe obtained information about her phone calls from Discover. *Id.* at 163. The appellate court noted that the jury heard testimony about the critical interaction of North American's employees with investigators. *Id.* The appellate court concluded that the evidence was sufficient to support the jury's finding that North American authorized Probe or Discover to obtain information about Lawlor's phone calls through pretexting. *Id.* The appellate court also found that North American admitted that Probe and Discover were acting as North American's agents because the Greenblatt affidavit and the motion to which it was attached constituted a judicial admission on the issue of agency. *Id.* The appellate court reversed the judgment for North American on its counterclaim after concluding that it was based upon an unproven assertion that Lawlor attempted to steer business from North American to Shamrock and that the Christianson letter contained confidential sales and profit information. *Id.* at 172-73. The appellate court recognized that at oral argument, counsel for North American specifically conceded that the Christianson letter was " 'not, in any legal sense, confidential.' " *Id.* at 173.

¶ 29        This court granted North American's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 30                                       ANALYSIS

¶ 31        North American initially contends that the trial court erred in denying its motion for a directed verdict, its motion for judgment *n.o.v.*, and its motion for a new trial on Lawlor's intrusion claim because there was no evidence to support the imposition of vicarious liability based upon the tortious actions of Probe or Discover.

¶ 32                        Tort of Intrusion Upon Seclusion

¶ 33        We first note that the tort of intrusion upon seclusion originates from a right of privacy and constitutes one of the four branches of the tort of invasion of privacy found in the

Restatement (Second) of Torts § 652B (1977).[4] Section 652B of the Restatement (Second) of Torts provides: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). For purposes of illustration relevant to the facts in this case, comment b to section 652B of the Restatement provides, in pertinent part:

> "b. The invasion may be *** by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents. The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the *** information outlined." Restatement (Second) of Torts § 652B cmt. b, at 378-79 (1977).

¶ 34    Although not raised by the parties, we recognize that this court has not expressly addressed whether the tort of intrusion upon seclusion is actionable in Illinois. In *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 417-18 (1989), we discussed the tort but declined to comment on its validity because even if the cause of action existed, the plaintiff's complaint had failed to allege the requisite elements to show prying into his personal affairs. Since our decision in *Lovgren*, all five appellate districts in Illinois have explicitly recognized the validity of a cause of action for invasion of privacy by intrusion upon seclusion. See *Schmidt v. Ameritech Illinois*, 329 Ill. App. 3d 1020 (1st Dist. 2002); *Benitez v. KFC National Management Co.*, 305 Ill. App. 3d 1027 (2d Dist. 1999); *Melvin v. Burling*, 141 Ill. App. 3d 786 (3d Dist. 1986); *Burns v. Masterbrand Cabinets, Inc.*, 369 Ill. App. 3d 1006 (4th Dist. 2007); *Davis v. Temple*, 284 Ill. App. 3d 983 (5th Dist. 1996). Courts in the majority of other states have also recognized this cause of action.[5]

---

[4]The other three branches include: (1) appropriation of the plaintiff's name or likeness (Restatement (Second) of Torts § 652C (1977)); *Eick v. Perk Dog Food Co.*, 347 Ill. App. 293 (1952); (2) disclosure of the details of the plaintiff's private life (Restatement (Second) of Torts § 652D (1977)); *Miller v. Motorola, Inc.*, 202 Ill. App. 3d 976 (1990); see also *Family Life League v. Department of Public Aid*, 112 Ill. 2d 449, 456-57 (1986) (referring to the cause of action but finding that the plaintiff's claims were purely speculative); and (3) publicity tending to put the plaintiff in a false light (Restatement (Second) of Torts § 652E (1977)); *Lovgren*, 126 Ill. 2d at 419.

[5]See, *e.g.*, *Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705 (Ala. 1983); *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123 (Alaska 1989); *Wal-Mart Stores, Inc. v. Lee*, 74 S.W.3d 634 (Ark. 2002); *Shulman v. Group W Productions, Inc.*, 955 P.2d 469 (Cal. 1998); *Goodrich v. Waterbury Republican-American, Inc.*, 448 A.2d 1317 (Conn. 1982); *Barker v. Huang*, 610 A.2d 1341 (Del. 1992); *Cason v. Baskin*, 20 So. 2d 243 (Fla. 1944) (*en banc*); *O'Neil v. Schuckardt*, 733 P.2d 693 (Idaho 1986); *Cullison v. Medley*, 570 N.E.2d 27 (Ind. 1991); *Bremmer v. Journal-Tribune Publishing Co.*, 76 N.W.2d 762 (Iowa 1956); *Moore v. R.Z. Sims Chevrolet-Subaru, Inc.*, 738 P.2d 852 (Kan. 1987); *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882 (Ky. 1981); *Estate of Berthiaume v. Pratt*, 365 A.2d 792 (Me. 1976); *Bailer v. Erie Insurance Exchange*, 687 A.2d 1375 (Md. 1997); *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231

¶ 35    Today, we join the vast majority of other jurisdictions that recognize the tort of intrusion upon seclusion.

¶ 36                                   Standard of Review

¶ 37    A motion for judgment *n.o.v.* should be granted only when " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). "In other words, a motion for judgment *n.o.v.* presents 'a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case.' " *Id.* (quoting *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942)). The standard for entry of judgment *n.o.v.* is a high one and is not appropriate if " 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' " *Id.* (quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995)). When the trial court has erroneously denied a motion for judgment *n.o.v.*, we will reverse the verdict without a remand. See *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). Although motions for directed verdicts and motions for judgments *n.o.v.* are made at different times, they raise the same questions and are governed by the same rules of law. *Id.* at 453 n.1. Our standard of review is *de novo*. *York*, 222 Ill. 2d at 178.

¶ 38    In contrast, on a motion for a new trial, the trial court will weigh the evidence and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 454. A verdict is against the manifest weight of the evidence only where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary and not based upon any of the evidence. *Id.* This court will not reverse the trial court's ruling on a motion for a new trial unless it is affirmatively shown that the trial court abused its discretion. *Id.* at 455.

¶ 39                                   Agency Relationship

¶ 40    North American does not dispute that there was a sufficient basis to conclude that the actions of the investigators in obtaining Lawlor's phone records without her authorization

---

(Minn. 1998); *Plaxico v. Michael*, 735 So. 2d 1036 (Miss. 1999); *Sofka v. Thal*, 662 S.W.2d 502 (Mo. 1983) (*en banc*); *Rucinsky v. Hentchel*, 881 P.2d 616 (Mont. 1994); *People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.*, 895 P.2d 1269 (Nev. 1995); *Hamberger v. Eastman*, 206 A.2d 239 (N.H. 1964); *Rumbauskas v. Cantor*, 649 A.2d 853 (N.J. 1994); *Sustin v. Fee*, 431 N.E.2d 992 (Ohio 1982); *Munley v. ISC Financial House, Inc.*, 584 P.2d 1336 (Okla. 1978); *Mauri v. Smith*, 929 P.2d 307 (Or. 1996); *Bennett v. Norban*, 151 A.2d 476 (Pa. 1959); *O'Shea v. Lesser*, 416 S.E.2d 629 (S.C. 1992); *Valenzuela v. Aquino*, 853 S.W.2d 512 (Tex. 1993); *Cox v. Hatch*, 761 P.2d 556 (Utah 1988); *Denton v. Chittenden Bank*, 655 A.2d 703 (Vt. 1994); *Roach v. Harper*, 105 S.E.2d 564 (W. Va. 1958).

constituted an intrusion or prying into her seclusion, that she had a reasonable expectation of privacy in her phone records, and the intrusion would be highly offensive to a reasonable person. Rather, North American contends that there was no evidence that it personally obtained any of Lawlor's phone logs and there was a lack of evidence to support an agency relationship between North American and Probe or Discover. North American asserts that it lacked knowledge of how the call logs were obtained and it had no control over the manner in which Probe or Discover did its investigative work. North American contends that Probe was hired to conduct the investigation and it was free to decide how to do so, including the manner in which to obtain phone records. North American argues that because no agency relationship was established it cannot be held liable for the conduct of Probe or Discover.

¶ 41 Lawlor responds that there was a sufficient basis to impose vicarious liability because the jury heard evidence that North American directed the "pretexting activities" by specifically requesting that Probe obtain phone records. North American was also responsible for providing the personal information necessary for Probe and Discover to obtain the records.[6] Lawlor also claims that North American was bound by the "judicial admission" contained in the Greenblatt affidavit in which he averred that Probe and Discover were acting as his agents.

¶ 42 Generally, a person injured by the tortious action of another must seek his or her remedy from the person who caused the injury. *Adames v. Sheahan*, 233 Ill. 2d 276, 298 (2009). The principal-agent relationship is an exception to this general rule. *Woods v. Cole*, 181 Ill. 2d 512, 517 (1998). "Under the doctrine of *respondeat superior*, a principal may be held liable for the tortious actions of an agent which cause a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff." *Id*. As a general rule, no vicarious liability exists for the actions of independent contractors. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999).

¶ 43 " 'An independent contractor is one who undertakes to produce a given result but in the actual execution of the work is not under the orders or control of the person for whom he does the work but may use his own discretion in things not specified *** [and] without his being subject to the orders of the [person for whom the work is done] in respect to the details of the work.' " *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 13 (2004) (quoting *Hartley v. Red Ball Transit Co.*, 344 Ill. 534, 539 (1931)). That someone is an independent contractor, however, does not bar the attachment of vicarious liability for his actions if he is also an agent. *Id.*

¶ 44 As this court has previously explained, no precise formula exists for deciding when a person's status as an independent contractor is negated. *Petrovich*, 188 Ill. 2d at 46. The determination of whether a person is an agent or independent contractor rests upon the facts

---

[6]In March 2009, the trial court granted North American's motion for summary judgment on Lawlor's claim that North American had intruded upon her seclusion by providing Probe with her social security number, date of birth, and home and cell phone numbers. Lawlor does not raise any issue here that the trial court's determination that the information provided to investigators from her personnel file was not private and could not form the basis of a finding of liability.

and circumstances of each case. *Id.* "[T]he cardinal consideration is whether that person retains the right to control the manner of doing the work." *Id.* Courts should also consider the following factors in considering the question of whether a person is an agent or independent contractor: (1) the question of hiring; (2) the right to discharge; (3) the manner of direction of the servant; (4) the right to terminate the relationship; and (5) the character of the supervision of the work done. *Id.* "The presence of one or more of the above facts and *indicia* are not necessarily conclusive of the issue." *Id.* at 47. These factors "merely serve as guides to resolving the primary question of whether the alleged agent is truly an independent contractor or is subject to control." *Id.* The burden of proving the existence and scope of an agency relationship is on the party seeking to impose liability on the principal. *Adames*, 233 Ill. 2d at 299.

¶ 45       If an agent is so authorized, it may also appoint subagents to perform those tasks or functions the agent has undertaken to perform for the principal. *AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill. App. 3d 17, 33 (2005). "Although an agent generally cannot 'properly delegate to another the exercise of discretion in the use of a power held for the benefit of a principal[ ]" [citation]' the ' "authority to conduct a transaction ... includes authority to delegate to a subagent the performance of incidental mechanical and ministerial acts.' Restatement (Second) of Agency § 78." *Id.* at 34 (quoting *United States v. Mendoza-Acuna*, 764 F.2d 699, 702 (9th Cir. 1985)).

¶ 46       After a careful review of the record, and with the above framework in mind, we cannot say when all of the evidence is considered, together with all reasonable inferences from the evidence in the light most favorable to Lawlor, that there was a total failure or lack of evidence to support the jury's determination that Probe was acting within its scope of authority as North American's agent when Probe requested that Discover, as a subagent, obtain Lawlor's phone records. We recognize that there was no direct evidence that North American knew how the phone records were acquired by investigators. The jury could reasonably infer, however, that North American was aware that Lawlor's phone records were not publicly available, and that by requesting such records from Probe and providing DiLuigi, Probe's president, with Lawlor's personal information, North American was setting into motion a process by which investigators would pose as Lawlor to obtain the material.

¶ 47       As recognized by the appellate court, the jury heard testimony about the critical interaction of North American's employees with Probe to support its factual determination that an agency relationship existed between North American and the investigators. Miller, North American's president, testified that he personally made the decision to investigate Lawlor after she left the company. He asked Greenblatt, North American's corporate attorney, to be in charge of the investigation and assigned Dolan, a vice president at North American, to be the company's contact person. Greenblatt simply retained Probe to conduct the investigation and, unlike Dolan, had no further role in it. Greenblatt testified that he did not limit in any way Probe's activities. While Greenblatt's law firm paid Probe, it was ultimately reimbursed by North American. Dolan signed off on the payments.

¶ 48       DiLuigi testified that Dolan wanted him to obtain Lawlor's phone records. Dolan provided him with her personal information contained in North American's files which was necessary in order for Discover to obtain the records. Dolan testified that he was unaware

what DiLuigi would do with the information, but he was not surprised when he received the phone logs. Miller testified that he assumed North American wanted phone records in connection with the investigation. He further testified that Dolan had the authority to provide the information to Probe from Lawlor's personnel file in order to obtain the phone records.

¶ 49 Dolan received numerous faxes from DiLuigi with information pertaining to Lawlor's calls during various periods in 2005. These records contained information about the phone numbers called, the times of the calls, and their duration. After receiving the call logs, Dolan, Miller, and Van Paris researched some of the numbers to see if they belonged to any customer. Additionally, Dolan asked DiLuigi to follow up on some of the numbers to see if they could determine to whom they belonged. DiLuigi testified that the investigation ended when Dolan informed him that there was no need to order more records.

¶ 50 We agree with the appellate court, when all of the evidence is considered, together with all reasonable inferences taken from it, in the aspect most favorable to Lawlor, that there was not a total failure or lack of evidence to support the jury's determination on agency in this case. Our standard of review is a high one, and based upon the evidence presented by Lawlor, it was not unreasonable for the jury to conclude that North American's conduct was consistent with a principal exercising control over its agent by directing it to obtain specific information and providing it with the necessary tools to accomplish the task.

¶ 51 North American's reliance on *Horwitz* for the proposition that it cannot be held liable for the tortious conduct of the investigators is misplaced. In *Horwitz*, we held that "where a plaintiff seeks to hold a client vicariously liable for the attorney's allegedly intentional tortious conduct, a plaintiff must prove facts demonstrating either that the client specifically directed, controlled, or authorized the attorney's precise method of performing the work or that the client subsequently ratified acts performed in the exercise of the attorney's independent judgment." *Horwitz*, 212 Ill. 2d at 13-14. We explained that "to hold otherwise, we would in effect compel clients in similar cases to oversee or micromanage every action taken by their attorneys during the course of the attorney-client relationship, and obligate clients to take control of their representation at the slightest hint of potentially wrongful conduct on the part of their attorneys." *Id.* at 17. Because there was no genuine issue of material fact presented regarding whether the client directed, controlled, authorized, or ratified the allegedly tortious conduct of the attorney, we concluded that the trial court properly granted summary judgment in the client's favor. *Id.* at 23. In contrast to *Horwitz*, this case does not concern the imposition of vicarious liability on North American for the actions of its attorney and, as previously determined, there was a sufficient basis for the jury to conclude that North American directed, controlled, or authorized the method in which investigators performed the work in obtaining Lawlor's phone records.

¶ 52 Due to our determination that the evidence adduced at trial was sufficient to support the jury's finding on agency, we need not address Lawlor's claim that North American was bound by the so-called "judicial admission" contained in the Greenblatt affidavit in which

he averred, prior to trial, that Probe and Discover were acting as his agents.[7]

¶ 53    For these reasons, we find the appellate court properly concluded that the trial court did not err either by denying North American's motion for a directed verdict on Lawlor's intrusion claim, or in denying its motion for judgment *n.o.v.* For the same reasons highlighted above, we agree with its determination that the jury's verdict that investigators were acting as agents of North American was not against the manifest weight of the evidence because the opposite result was not clearly evident and the jury's finding was not unreasonable, arbitrary, and not based upon any of the evidence. Consequently, we find the appellate court correctly held that the trial court did not abuse its discretion in denying North American's motion for a new trial.

¶ 54                                    Punitive Damages

¶ 55    We next consider North American's contention that the $1.75 million punitive damages award reinstated by the appellate court does not comport with Illinois common law principles.

¶ 56    As a threshold matter, we reject North American's reliance on *Mattyasovszky v. West Towns Bus Co.*, 61 Ill. 2d 31 (1975), for the proposition that the issue of punitive damages should not have been presented to the jury because North American did not personally obtain any phone records in this case. In *Mattyasovszky*, this court explained that the punitive and admonitory justifications for the imposition of punitive damages are sharply diminished in those cases in which liability is imposed vicariously. *Id.* at 36. This court held, however, that punitive damages could properly be awarded against a principal because of an act by an agent, *inter alia*, if the principal authorized the doing and the manner of the act. *Id.* As previously determined, sufficient evidence was proffered in this case for the jury to conclude that North American authorized the manner in which investigators obtained Lawlor's phone records. We therefore decline North American's request to reverse the punitive damage award outright.

¶ 57    Turning to the remainder of its argument, North American does not argue that the trial court erred by allowing the jury to consider whether the conduct at issue in obtaining Lawlor's phone records was egregious enough to warrant any punitive damages. Instead, North American argues that the trial court should have remitted the award further to no more than actual damages. North American contends that the evidence does not support a higher award because the conduct at issue was minimally reprehensible; it pursued the investigation

---

[7]We note, however, that it was undisputed that this affidavit did not dispense with the need for Lawlor to prove the existence of an agency relationship, which was a fact question presented to the jury. See *Konstant Products, Inc. v. Liberty Mutual Fire Insurance Co.*, 401 Ill. App. 3d 83, 86 (2010) (a judicial admission is a formal admission in the pleading that has the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact). We further note that the jury returned special interrogatories finding the existence of an agency relationship, which would have been unnecessary if the Greenblatt affidavit had the effect of withdrawing this issue from the jury.

to protect a legitimate business interest; the limited nature of the harm done was reflected by the jury's modest award of actual damages; and it was undisputed that Lawlor did not seek any medical or psychological treatment. Lawlor responds that the evidence supports the jury's award because North American intentionally invaded her privacy and it did so on more than one occasion through the use of fraud and deception.

¶ 58        This court recently addressed a similar challenge in *Slovinski v. Elliott*, 237 Ill. 2d 51 (2010), and set forth the common law principles under which punitive damages may be awarded:

> "Punitive damages 'are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.' *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990). Punitive damages may be awarded when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.' *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978). To determine whether punitive damages are appropriate, 'the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.' Restatement (Second) of Torts § 908(2) (1979). Because punitive damages are penal in nature, they 'are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded.' *Kelsay*, 74 Ill. 2d at 188.

> Section 2-1207 of the Code of Civil Procedure (735 ILCS 5/2-1207 (West 2000)) provides that the 'trial court may, in its discretion, with respect to punitive damages, determine whether a jury award for punitive damages is excessive, and if so, enter a remittitur and a conditional new trial.' ***

> * * *

> An award of punitive damages must be remitted to the extent that there is no material evidence to support it." *Slovinski*, 237 Ill. 2d at 57-58, 64.

¶ 59        When a trial court reduces the jury's punitive damages award by remittitur, as in this case, we review the trial court's decision for an abuse of discretion. *Id.* at 58. An abuse of discretion will be found where there is no recognizable basis in the record to support the remittitur order entered by the trial court. *Id.* at 60.

¶ 60        North American relies on *Slovinski* for the proposition that the punitive damages award in this case should not exceed the actual damages award. In *Slovinski*, the plaintiff filed a complaint alleging defamation *per se* against Cherry Communications, Inc., and its chief executive officer, defendant James Elliot. *Id.* at 54. According to the plaintiff's complaint, prior to his termination from the company, he had completed its 1995 annual financial statement and the monthly statements for January, February, and March 1996. *Id.* Several months after the plaintiff's employment was terminated, he learned of a meeting that occurred between the defendant and representatives from WorldCom, one of Cherry's suppliers. *Id.* During the meeting, WorldCom requested his former employer's 1995 annual

-16-

financial statement and updated monthly statements. *Id.* at 54-55. Plaintiff alleged that during this meeting Elliott made false statements about him to the WorldCom representatives. *Id.* at 55. Specifically, defendant allegedly stated that Cherry's financial statements were not available because the plaintiff had not completed them; he " 'was not doing his job' "; he " 'came in late and left early' "; he was " 'sneaking off to do workouts' "; and he " 'spent his time chasing pussy all day.' " *Id.*

¶ 61        Following the entry of a default judgment in the plaintiff's defamation lawsuit, the jury awarded him $81,600 in damages for emotional distress and $2 million in punitive damages. *Id.* at 53. The trial court remitted the punitive damage award to $1 million. *Id.* The appellate court affirmed the default judgment and the award for emotional damage, but remitted the punitive damages award to $81,600. *Id.* at 53-54. This court upheld the appellate court decision reducing the punitive damages award to an amount equal to that of the actual damage award. *Id.* at 65. We explained that the defamatory statements at issue were made only once in the presence of a limited number of individuals and there was no evidence of an intentional, premeditated scheme to harm the plaintiff. *Id.* at 64. This court further noted that although there was a damage award returned for emotional distress, there was no evidence of visits to a doctor or therapist, missed work, or any alteration in plaintiff's daily normal activities. *Id.* Consequently, we concluded that these facts put the conduct at issue on the low end of the scale for punitive damages. *Id.*

¶ 62        We find this case is similar to *Slovinski* and warrants the same outcome of an award of punitive damages equal to the award of compensatory damages. There was no evidence presented to the jury that North American had an intentional, premeditated scheme to harm Lawlor. As recognized by the trial court, the phone records were obtained as part of a legitimate investigation into a possible violation of a noncompetition agreement, not out of any animus toward Lawlor, and concerned a private dispute which did not implicate any general public policy. As in *Slovinski*, this places North American's conduct on the low end of the scale for punitive damages, far below those cases involving a defendant's deliberate attempt to harm another person. *Id.*

¶ 63        There are other factors which also lead us to conclude that neither the appellate court's judgment reinstating the punitive damage award nor the trial court's remittitur order can stand. Lawlor's phone records were only viewed internally by a handful of North American's employees. No evidence was presented that the records were distributed outside of the company, or that they were used for any purpose other than to determine if Lawlor had contact with one of North American's customers. Additionally, the jury's verdict with respect to compensatory damages shows limited harm to Lawlor. She began her employment with Shamrock within months of voluntarily leaving North American after choosing to take a few months off. Lawlor testified that after learning North American had obtained her phone records, she vomited, experienced anxiety, and had periods of sleeplessness. Additionally, she enhanced the security features on her phone and at her home. Therefore, similar to the plaintiff in *Slovinski*, the evidence showed that she never sought medical or psychological treatment and there was no evidence of any alteration in her normal daily activities or that she missed work.

¶ 64        Lawlor suggests that her attorney fees should be considered in the award of punitive

damages. We need not consider this argument, however, because as recognized by the trial court there was no basis upon which to consider her attorney fees on this record. Lawlor simply testified that she incurred $620,000 in legal fees to two firms and that she had paid approximately half of that amount. It was entirely unclear what amount of those fees had been incurred as part of her intrusion claim and there were various other claims that she both pursued and defended in this case. Similarly, there is no basis for us to consider her contention that North American's investigation of other former employees, which she claims included obtaining phone records, should be considered in determining the appropriateness of the punitive damage award here. As acknowledged by Lawlor, the trial court barred any evidence of other investigations that North American may have pursued concerning other former employees.

¶ 65    We agree with the trial court that the evidence was sufficient to support the jury's determination to award some measure of punitive damages for North American's wrongful conduct in obtaining the phone records in this case. We also recognize that evidence was presented that North American has a net worth of approximately $50 million. The conduct at issue also apparently occurred on more than one occasion because phone records were obtained by the investigators for different time periods in 2005. We do not believe, however, that a punitive damage award of $650,000 is warranted in this case, particularly when the trial court specifically found that the conduct at issue was "*de minimus*, fairly much, on all criteria." We also recognize that this case concerns the imposition of punitive damages in a case of vicarious liability, and that this court has previously held that the justification for punitive damages are sharply diminished in such matters. See *Mattyasovszky*, 61 Ill. 2d at 36. For these reasons, we find the trial court abused its discretion by not further reducing the jury's punitive damages award. We conclude, as in *Slovinski*, that the highest award the evidence of record may support is equal to the award of compensatory damages, or $65,000.

¶ 66    Based upon this outcome, we need not address North American's alternative contention that the punitive damages award violated federal due process because we conclude that under state common law principles the award should not exceed the actual damages award in this case.[8]

¶ 67                      North American's Counterclaim

¶ 68    Finally, we turn to North American's contention that the appellate court erred in concluding that the trial court's finding that Lawlor breached her fiduciary duty of loyalty while in its employ was against the manifest weight of the evidence. North American contends that it introduced sufficient evidence to support the trial court's determination that Lawlor attempted to steer the MapQuest business to Shamrock at a time when she was still employed by North American, but was actively seeking employment at Shamrock.

---

[8]We note, however, that the Supreme Court has stated that under federal due process "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 425 (2003). The ratio following the trial court's remittitur in this case was 10 to 1.

¶ 69     To state a claim for breach of fiduciary duty, it must be alleged and ultimately proved: (1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the party complains. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000). Employees as well as officers and directors owe a duty of loyalty to their employer. *Mullaney, Wells & Co. v. Savage*, 78 Ill. 2d 534, 546-47 (1980); *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 529 (1993). Accordingly, a fiduciary cannot act inconsistently with his agency or trust and cannot solicit his employer's customers for himself. *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill. App. 3d 671, 683 (1978).

¶ 70     Our standard of review is whether the trial court's finding of breach of fiduciary duty was against the manifest weight of the evidence. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 452 (2009). A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 71     Here, we agree with the appellate court that the record is entirely devoid of evidence to support the judgment in favor of North American. The trial court's judgment was based solely on an unproven assertion that Lawlor unsuccessfully attempted to steer the MapQuest business from North American to one of its competitors, Shamrock, while still working at North American. The only evidence that touched on business diversion came by way of the affidavit of Kevin Bristow, an outside consultant for MapQuest, which was admitted over Lawlor's hearsay objection. At trial, Bristow disavowed the affidavit and testified that Lawlor did not provide him with any information regarding companies other than North American. Specifically, she never recommended, nor did he consider, involving Shamrock with the MapQuest business. Lawlor also testified that while employed by North American, she never mentioned Shamrock to MapQuest or to any of her other customers. In Lawlor's posttrial motion, she challenged the trial court's reliance on the Bristow affidavit as substantive evidence. In denying the motion, as recognized by North American, the trial court specifically stated that it did not rely on the affidavit in reaching its decision. We note that North American does not contend here that the affidavit should be relied upon as substantive evidence in determining whether the trial court's judgment is supported by the manifest weight of the evidence.

¶ 72     North American appears to suggest that the trial court's judgment was not against the manifest weight of the evidence because the trial court properly relied upon the testimony that Bristow contacted North American after Lawlor's departure from the company and set up an appointment to meet with Todd Van Paris, North American's vice president and general manager, and Mike Perez, Lawlor's direct supervisor, and that the noncompetition investigation ensued shortly thereafter. According to North American, based upon this sequence of events, the trial court could infer that Bristow told Van Paris and Perez that Lawlor had attempted to steer business to North American's competitor. North American also suggests that there was sufficient evidence to support the trial court's determination because Lawlor and Bristow had a long-standing prior relationship; they were working together on the MapQuest account; they frequently communicated with one another and did not include Lawlor's supervisors; and Lawlor was actively interviewing with Shamrock. We

-19-

find this evidence too speculative and wholly insufficient to conclude that Lawlor, while employed by North American, tried to divert business to Shamrock, or to any other competitor.

¶ 73    We note in conclusion that North American does not raise any claim before this court that the 2004 letter sent by Lawlor to Greg Christenson, an executive at Shamrock, contained confidential sales information that could somehow form a basis for upholding the trial court's judgment on the breach of fiduciary duty claim. We reiterate that the appellate court in rejecting this claim recognized that counsel for North American specifically conceded that the Christianson letter was " 'not, in any legal sense, confidential.' " 409 Ill. App. 3d at 173.

¶ 74    Accordingly, we find the appellate court properly reversed the trial court's judgment in North American's favor on the counterclaim because its determination that Lawlor breached her fiduciary duty was against the manifest weight of the evidence.

¶ 75                                    CONCLUSION

¶ 76    For the reasons stated, we affirm the appellate court's judgment which affirmed the trial court with respect to Lawlor's intrusion claim; reverse the appellate court's judgment which reinstated the jury's award of punitive damages in Lawlor's favor on the intrusion claim and affirm the judgment of the circuit court as modified by a reduction in the punitive damage award from $650,000 to $65,000; and affirm the appellate court's judgment which reversed the trial court's order in favor of North American on the breach of fiduciary duty claim.

¶ 77    Appellate court judgment affirmed in part and reversed in part.
¶ 78    Circuit court judgment affirmed in part, reversed in part, and modified in part.

¶ 79    CHIEF JUSTICE KILBRIDE, concurring in part and dissenting in part:

¶ 80    I join the majority opinion in all but one issue in this appeal. Consistent with my dissent in *Slovinski v. Elliott*, 237 Ill. 2d 51 (2010), I respectfully believe that the majority failed to apply the highly deferential standard of review properly in this case. In determining whether the appellate court committed error by reinstating the jury's punitive damages award, we must also resolve the underlying question of whether "there [is] a basis in the record to support the remittitur entered by the circuit court." *Slovinski*, 237 Ill. 2d at 62. After closely reviewing the record in this case, I cannot agree with the majority that the trial court abused its discretion in remitting the jury's punitive damages award to $650,000. Thus, while I agree with the majority that the appellate court erred by reinstating the jury's original punitive damages award, I respectively dissent from that portion of the opinion rejecting the punitive damages award entered by the trial court on remittitur (*supra* ¶¶ 57-66).

¶ 81    The jury initially awarded Lawlor $1.75 million in punitive damages, and the trial court reduced that award by nearly 63% to just $650,000 on remittitur. As in *Slovinski*, the majority acknowledges that this court may overturn the trial court's determination only if "there is *no recognizable basis* in the record to support the remittitur order entered by the trial court" (emphasis added) (*supra* ¶ 59), but despite this high bar, the majority rejects the

trial court's determination. I dissented in *Slovinski* because I believed that, while the majority paid lip service to the proper standard of review, it did not apply that standard, instead substituting its own judgment for that of the trial court. *Slovinski*, 237 Ill. 2d at 65 (Kilbride, J., dissenting). I believe the same is true here.

¶ 82        Indeed, the majority's error is even more evident here because the record establishes that Lawlor, unlike the plaintiff in *Slovinski*, presented evidence showing significant steps she took to alter both her lifestyle and that of her family, as well as to enhance their security, after she learned her phone records had been improperly obtained by pretexting. During the summer of 2005, the evidence shows that Lawlor and her neighbors noticed a number of cars not belonging to anyone in the neighborhood parked near her residence, with the occupants watching her home for hours at a time. Subsequently, she found out in October 2005 that, in addition to her residence being placed under surveillance, her home and cell phone records had been repeatedly obtained without her permission by someone who was impersonating her using personal information obtained from North American (pretexting). Lawlor testified that she immediately became hysterical, vomited, and was "[shaken] *** to the core." She "didn't go outside," alerted her parents and neighbors to a possible security threat in the area, "was ill *** nervous *** paranoid ***[, and] didn't trust anyone." Before discovering the pretexting scheme, she never suffered from feelings of paranoia, nervousness, or unusual stress.

¶ 83        In response to North American's improper intrusion into her privacy, Lawlor also severely limited her three young children's activities, refusing to allow them to go out to play and requiring them to be with her or her husband "at all times." She curtailed the children's sports activities "because [she] was afraid for what could happen."

¶ 84        Even four years after discovering her phone records had been improperly obtained, Lawlor testified to "the stress that this has caused; the strain that it has put on [her] marriage; the nervousness [she feels] with the kids, whether it's a sporting event that they're at, that I or my husband do not ever leave them at a two-hour practice by themselves, ever." She stated that "because of what has been done to [her], [she doesn't] trust anyone anymore." Notably, the trial judge did not find that her testimony lacked credibility.

¶ 85        Moreover, to secure her phone records against further intrusions, Lawlor enhanced her phone security features, instituting passcodes and requiring her to fax images of the front and back of her driver's license to her home phone service provider and to visit her cell phone service provider's store personally and show her driver's license to discuss her accounts. When asked why she did not change her phone numbers after discovering the theft of her call logs, Lawlor explained that she believed it would be futile because the defendant would simply use pretexting again to obtain call logs for the new numbers.

¶ 86        In addition to these alterations in her daily life, Lawlor increased the security at her residence by changing the locks and installing a home security system that was left on regardless of whether the family was in or out of the house. She and her husband also revised the provisions for their minor children's guardian in their wills in case "anything were to happen to" them.

¶ 87        Lawlor's husband confirmed that she "seemed upset a lot, paranoid," "did not like going

out as much," and that their previously quite active social life had "changed a lot." He stated that Lawlor no longer went out by herself as often and did not "take the kids out as much." "[T]hings that [the family] used to do a lot, [they] don't do anymore," such as "go[ing] out a lot and hav[ing] parties at [their] own house a lot."

¶ 88    Thus, contrary to the majority's claim that "there was no evidence of any alteration in her normal daily activities" (*supra* ¶ 63), the record is replete with evidence that Lawlor significantly altered her daily routine and lifestyle, as well as those of her small children, in response to North American's improper acquisition of her private call logs.

¶ 89    Although Lawlor admitted she did not seek medical or psychological help before trial because she "thought [she] could do this on [her] own and just try and figure out how to get through this," she eventually decided she was "sick of going through the motions and it just being a day-to-day thing." Because she continued to suffer from the negative effects of the incident, she concluded she needed "help in order to quit living in the past and put this behind" her. She offered an additional explanation for her failure to seek medical or psychological treatment before trial as well, stating she did not seek counseling earlier because she did not "want North American to get those records." "Because [she] knew that North American got *** [her] private information, when they shouldn't have, *** [she] didn't want to give them any more information at all."

¶ 90    Lawlor further explained that before discovering the pretexting she did not suffer from any sleep problems, but after making that discovery, she had not slept through the night in four years, waking up two or three times every night. Her husband confirmed that her sleep remained "[v]ery fitful." She also complained that her eating habits had changed, due to either the added stress or her sleep problems, and that, consequently, she had "put on a lot of weight," a fact her husband acknowledged as well. He testified that Lawlor became ill more often, too, suffering from "headaches a lot more, cold sores, a lot of stress-related stomach issues." He explained that she "almost never got sick" before uncovering North American's investigation. Unlike *Slovinski*, here the record contains substantial evidence that Lawlor suffered both physical and psychological harm from North American's misconduct. *Cf. Slovinski*, 237 Ill. 2d at 64 (stating "there was no evidence of any physical harm to plaintiff *** no evidence of any alteration in plaintiff's normal daily activities"). The plaintiff's failure in *Slovinski* to show any physical or psychological harm beyond the emotional distress the plaintiff felt when he had to explain the defendant's defamatory statements to his family (*Slovinski*, 237 Ill. 2d at 55-56) stands in sharp contrast to Lawlor's showing in the instant case.

¶ 91    Despite the majority's tentative recognition that, unlike the single incident at issue in *Slovinski*, "[t]he conduct at issue [here] also apparently occurred on more than one occasion" (*supra* ¶ 65), its analysis fails to acknowledge the trial court's express finding that North American's conduct "was wrongful, *** intentional, and *** deceitful and *** *occurred more than six times*." (Emphasis added.) *Supra* ¶ 26. Instead, the majority focuses on the trial judge's next statement, that the misconduct "was *de minimus*, fairly much, on all criteria," as a basis for further slashing the judge's already nearly 63% reduction in the jury's punitive damages award on remittitur. *Supra* ¶ 65. The majority's use of the trial judge's statement to justify its additional reduction in Lawlor's punitive damages award cannot withstand close

scrutiny.

¶ 92    As the record shows, the trial court made it clear that the damage award on remittitur was the result of its thorough examination of the evidence in its entirety. Thus, its statement that North American's misconduct was "*de minimus*, fairly much" described a general conclusion it reached before reducing the jury's award to $650,000. The majority's interpretation of that statement, however, implies that the trial court somehow ignored its own conclusion when it set the award on remittitur, even using the trial court's statement to support the rejection of its own award. The trial court's statement need not be viewed as undermining its judgment on remittitur. It is indisputable that the court set the punitive damages award fully cognizant of its own views about the degree of North American's misconduct. That, however, is not the only factor to be considered in setting an award for punitive damages. See *Slovinski*, 237 Ill. 2d at 57-58. Thus, despite the statement relied on by the majority, the trial court concluded, that taking all the relevant factors into consideration, $650,000 was the proper punitive damages award on remittitur. Accordingly, I remain unpersuaded by the majority's interpretation.

¶ 93    That interpretation fails to recognize that " 'the character of the defendant's act [and] the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause' " are only two of the criteria used " '[t]o determine whether punitive damages are appropriate.' " *Supra* ¶ 58 (quoting *Slovinski*, 237 Ill. 2d at 58). The third criterion is the defendant's wealth. *Slovinski*, 237 Ill. 2d at 58. Here, North American was a $50 million dollar company. Although the majority mentions this fact, it does not overtly consider the role North American's value plays in setting a punitive damages award. *Supra* ¶ 65. Punitive damages " 'are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.' " *Slovinski*, 237 Ill. 2d at 57-58 (quoting *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990)).

¶ 94    To many small companies, punitive damages of far less than $650,000 would indeed be sufficient punishment to deter similar misconduct in the future. Here, however, after considering all the evidence, the trial court set $650,000 as the sum necessary to punish North American, a company with a net worth of 77 times that amount. Unlike the majority (*supra* ¶ 65), I cannot conclude that the punitive damages award on remittitur was a clear abuse of the trial court's discretion when I consider the purpose served by punitive damages. Further, given the financial strength of the company, I am forced to question the deterrent value of the $65,000 punitive damages award imposed by the majority in this case.

¶ 95    Finally, when reviewing the jury's $1.75 million punitive damages award for Lawlor, the trial court found it "shocks this judicial conscience," far surpassing her request for punitive damages of 10 times her compensatory damages, and was "a direct result of passion," due to the jury's "consider[ation of] the conduct of North American as against Kathy Lawlor," without any consideration of her own misconduct. In radically reducing the award by almost 63%, the trial court expressed its belief that both parties engaged in "wrongful, deceitful conduct *** against each other." Relying on their joint misconduct, the court commented that "[t]his is the only case that I have seen in the panoply of cases that have been given to me, where each side, I believe, was wronged by the other, in a willful and reprehensible way, and

the consideration of punitive damages was appropriate." In revising the punitive damages award, the court noted its "global ability to look at the conduct of both warring parties here" in evaluating a punitive damage award, again demonstrating its apparent belief that both parties' misconduct should be evaluated in setting the punitive damages awards.

¶ 96 To justify its dramatic reduction in Lawlor's punitive damages award even further, the trial court expressly stated that it "even took into account the fact that [the pretexting] was done to protect business by North American" and was done without "any motive to enrich themselves at the expense of Kathy Lawlor." In addition, the trial judge found that Lawlor was not "in a vulnerable position" and was a "highly paid, sophisticated businesswoman," not a victim, and that both parties had engaged in wrongful conduct against each other, with Lawlor violating her fiduciary duty by revealing North American's confidential sales and profit information to Shamrock. Indeed, the court attributed much of the initial fault to Lawlor, stating that she "started a course of conduct that was reprehensible and deceitful" by giving "confidential information, which [the judge found] to be confidential, even though it was argued by plaintiff that it wasn't."

¶ 97 From these findings, the trial court clearly understood that North American's conduct was not based on any personal *animus* against Lawlor, and the court heavily weighed what it believed to be her serious misconduct in disclosing North American's "confidential" information when it remitted the jury's punitive damages award by almost 63%. The court's comments strongly indicate it was not inclined to limit its reduction in her award due to favoritism or sympathy for her. Nonetheless, the majority somehow concludes that the trial court still set Lawlor's award 10 times too high.

¶ 98 Undermining that conclusion even further, the trial court found that Lawlor actually set in motion the entire course of misconduct alleged by both parties when she breached her fiduciary duty to North American by disclosing allegedly "confidential" sales and profit information to Shamrock. The appellate court, however, reversed "the trial court's judgment in North American's favor on the counterclaim because its determination that Lawlor breached her fiduciary duty was against the manifest weight of the evidence." I note that the majority correctly affirms the appellate court's decision on that issue. *Supra* ¶ 74. Because the trial court relied heavily on its finding that Lawlor breached her fiduciary duty to North American, the appellate court's subsequent determination that the evidence failed to establish any breach substantially undercuts the trial court's justification for its massive reduction in her punitive damages award. At a minimum, the rejection of one of the primary bases for the trial court's huge reduction on remittitur cannot rationally justify an additional 90% reduction in that award in this court. Nonetheless, that is what the majority does in this case.

¶ 99 The unpersuasive and counterintuitive rationale of the majority opinion, combined with the obvious factual distinctions between this case and *Slovinski*, lead me to conclude that the majority did not properly review the trial court's award on remittitur for an abuse of discretion. Instead, the court appears to have substituted its own view for that of the trial court. While that would be appropriate if the applicable standard of review were *de novo*, here it is not. *Supra* ¶ 59 (noting the standard of review is abuse of the trial court's discretion).

¶ 100    Accordingly, based on my examination of the record, I cannot say that "there is no material evidence" or "no recognizable basis in the record" to support the trial court's reduced punitive damages award to Lawlor on remittitur. See *Slovinski*, 237 Ill. 2d at 64; *supra* ¶¶ 58, 59. For this reason, I respectfully dissent from the portion of the majority opinion further cutting the punitive damages awarded to Lawlor on remittitur.