2024 IL App (1st) 231044-U

No. 1-23-1044

Order filed April 25, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 2061 |
| | ) | |
| ZENOVII BLIUSOVYCH, | ) | Honorable |
| | ) | Joseph Cataldo, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for home invasion and aggravated battery affirmed where the trial court did not err when it denied defendant's posttrial motion for judgment notwithstanding the verdict.

¶ 2    Following a jury trial, defendant Zenovii Bliusovych was convicted of home invasion and aggravated battery and was sentenced to concurrent prison terms of nine years and three years, respectively. On appeal, Bliusovych contends the trial court erred when it denied his posttrial motion for judgment notwithstanding the verdict because the State failed to prove him guilty

beyond a reasonable doubt. Bliusovych claims there was no evidence that he knowingly and voluntarily committed the offenses where his medical expert testified that he was sleepwalking at the time of the offenses and, thus, was not consciously aware of his conduct. We affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4       Bliusovych was tried on one count each of home invasion and aggravated battery. At trial, Remy Shorter testified that he and his girlfriend, Tiffany Brown, lived in unit 3A on the third floor of a three-floor condominium building in Mount Prospect, Illinois. There were two units on each floor, with 3B across the hall from 3A. The building had locked front and rear entrances, and guests could only enter the building if they had a key or were buzzed in through the front entrance. Shorter's two-bedroom unit also had a front and rear entrance. The key for Shorter's unit was different than the key for the building.

¶ 5       In the late hours of November 12, 2021, Shorter was playing video games in one of the bedrooms. Brown was asleep in the master bedroom. Between 11 p.m. and midnight, Shorter took their dog, Milo, outside for a walk. Afterwards, he reentered his unit through the rear door, which had an automatic closure. He did not lock the rear door after reentering. Shorter turned off the lights in the living room and returned to playing video games in the bedroom.

¶ 6       About 1:30 a.m., Shorter heard Milo barking in the living room. He looked up and saw the lights go on in the living room. Brown was still asleep in the master bedroom. Shorter walked into the living room and saw Bliusovych standing in the middle of the room. Shorter did not know Bliusovych and had never seen him before. Bliusovych was wearing jeans and a long-sleeved shirt.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

He wore socks but no shoes. Shorter asked Bliusovych what he was doing in his home. Bliusovych looked directly at Shorter but did not respond. Shorter was "nervous and scared" and punched Bliusovych in the face. Bliusovych fell onto the couch. Shorter punched Bliusovych again.

¶ 7     Shorter thought Bliusovych was possibly his landlord and backed up to allow Bliusovych to stand. Bliusovych stood and took a few steps further into the room. Shorter backed up and yelled at Bliusovych, asking why Bliusovych was in his home and what he wanted. Bliusovych looked at Shorter but did not respond. Shorter pointed to the back door and told Bliusovych to leave several times. Bliusovych stood face-to-face with Shorter, less than two feet apart. Bliusovych frowned at Shorter and began tilting his head to the left and right. Bliusovych was looking at Shorter up and down, "sizing [him] up." Bliusovych pulled up his shirt sleeves and turned his watch upside-down.

¶ 8     Brown entered the living room and Shorter told her to call the police. Bliusovych began breathing heavily. Bliusovych made fists with both of his hands and thrust them down at his sides three times, while yelling "ahhh." Shorter grabbed a TV tray and held it over his shoulder with both hands. Shorter warned Bliusovych that he would use the tray if Bliusovych attacked him. Bliusovych lunged into Shorter's chest with his shoulder, pushing Shorter into the wall. Shorter struck Bliusovych on top of the head with the TV tray. Shorter braced himself against the wall as Bliusovych continued pushing into Shorter's chest with his shoulder.

¶ 9     Bliusovych and Shorter stumbled together into the room where Shorter had been playing video games. Bliusovych made a quick "maneuver" and Shorter fell to the floor, landing on his buttocks, with Bliusovych standing behind him. Bliusovych immediately placed Shorter's neck in a "choke hold," with one of his forearms behind Shorter's head and the other in the front. Shorter

tried to pull away, but Bliusovych gripped "tighter and tighter." Shorter was no longer able to breathe and used what felt like his last breath to call Brown for help. Shorter felt like he was going to lose consciousness.

¶ 10    Brown entered the room while still on the phone with the police. Brown yelled at Bliusovych to get off Shorter. Bliusovych eventually let go of Shorter and ran out of the bedroom, through the living room, and out the rear door. Shorter stood but immediately fell to the floor gasping for breath. He crawled to the couch in the living room. The police arrived a few minutes later. Shorter had difficulty breathing for several minutes and vomited. He was treated by paramedics in his condominium. In court, Shorter identified photographs taken by the police depicting bruises on his neck and face.

¶ 11    At approximately 7 a.m., Brown woke Shorter and said Bliusovych was exiting their building and was outside. Shorter observed Bliusovych walking in the parking lot in front of the building. Shorter ran downstairs and outside into the parking lot. Bliusovych looked at Shorter and immediately entered his vehicle, which was parked in the lot, and quickly closed his door. Bliusovych pulled out of the parking space and drove away. Shorter took a picture of the rear of Bliusovych's vehicle and license plate.

¶ 12    As Shorter walked back to his building, he saw Bliusovych drive out of the parking lot, turn left, and drive back into the lot. As Shorter walked up the stairs to his unit, an unknown man came down the stairs from unit 3B. It was not the man who lived there. The man glanced at Shorter and exited the building. The door slammed closed behind him. The man looked towards Shorter, as Shorter took photographs of him. The man tried to open the door but could not. The man yelled at Shorter to let him in the building, claiming he had forgotten his phone upstairs. Shorter refused.

The man entered Bliusovych's vehicle through the passenger door, and Bliusovych drove away. Shorter subsequently identified Bliusovych in a photo array.

¶ 13    On cross-examination, Shorter acknowledged that when he was face-to-face with Bliusovych in the living room, Bliusovych was staring at him and not talking. Shorter denied that Bliusovych was "just standing there" and repeatedly testified that Bliusovych was "clearly looking me up and down." Shorter maintained Bliusovych was "sizing me up like he was mad that I punched him." Bliusovych was "focused" on Shorter and did not look towards Brown or the dog. When Shorter threatened Bliusovych with the TV tray, Bliusovych "looked fully confident" and "like he was about to do something."

¶ 14    Tiffany Brown testified that during the early morning hours of November 13, 2021, she was asleep in her bedroom while Shorter played video games in the second bedroom. She awoke to their dog barking and heard a commotion in the living room. She walked to the living room and observed Bliusovych, standing and looking at Shorter while moving his head from side to side. Brown had never seen Bliusovych before. Bliusovych looked "really confused and just like not aware, almost blank looking." Shorter told Brown to call the police. A recording of Brown's 911 call was played in court and admitted into evidence.

¶ 15    Brown heard Shorter ask Bliusovych what he was doing in their home. Shorter yelled at Bliusovych to leave but he did not. Bliusovych adjusted his sleeves and twisted his watch. Bliusovych then growled and lunged at Shorter. The men struggled with each other and fell into the second bedroom. Shorter yelled for Brown. She ran into the bedroom and saw that Bliusovych had Shorter in a chokehold. Brown yelled at Bliusovych to release Shorter, but he did not. Brown struck Bliusovych in the head with her phone, and he released Shorter. Bliusovych ran out the rear

door of their unit. Brown knew Bliusovych did not leave the building because she did not hear him go down the stairs nor did she hear the loud thud of the building's door closing. The police arrived shortly after Bliusovych left. Shorter had scratches and bruises around his neck.

¶ 16    Brown did not fall back asleep that night. Around 7 a.m., she was looking out their bedroom window when she saw Bliusovych exit the front door of their building and walk towards the visitor's parking area. Brown awoke Shorter and told him Bliusovych was outside. Shorter ran downstairs, and Bliusovych entered a vehicle. Brown subsequently identified Bliusovych in a photo array.

¶ 17    On cross-examination, Brown acknowledged that Bliusovych was not wearing shoes. Bliusovych was not swaying or staggering, nor was he speaking. Brown described the incident as "traumatic" and one of the "[s]cariest" things she had ever seen because a person she did not know refused to leave her house. She agreed it was "strange" and "confusing." The only sound Brown heard Bliusovych make was "a growl."

¶ 18    Mount Prospect police detective Miguel Trejo testified that Shorter gave him a photograph of Bliusovych's vehicle and license plate. The vehicle was registered to a business owned by Bliusovych. On January 10, 2022, Trejo went to Bliusovych's residence and spoke with him. Trejo then interviewed other people. On January 20, 2022, Trejo arrested Bliusovych at his residence.

¶ 19    After the State rested, Bliusovych moved for a directed finding, arguing that the State failed to establish his intent and that the evidence suggested he had been sleepwalking. The State argued that there was no evidence of sleepwalking; rather, Bliusovych's acts were deliberate and intentional. The trial court reviewed the evidence in detail and found that Bliusovych's acts,

including rolling up his sleeves and engaging in a fight, demonstrated that he was conscious. Accordingly, the court denied Bliusovych's motion.

¶ 20    Dr. Rosalyn Aranas, a neurologist and sleep medicine specialist, testified for Bliusovych. She was not tendered or qualified as an expert. Bliusovych's first visit with Dr. Aranas was in June 2022. Bliusovych told Dr. Aranas that he had episodes of sleepwalking as a child. The frequency of these episodes increased in 2009, mostly due to stress and alcohol. Bliusovych "wanted a diagnosis" from Dr. Aranas. She conducted a physical exam, the results of which were normal. An MRI of Bliusovych's brain and EEG were also normal. Dr. Aranas diagnosed Bliusovych with parasomnia, known as sleepwalking, and circadian rhythm disorder, due to working long hours.

¶ 21    Dr. Aranas explained that a person with non-REM parasomnia can rise from bed while in a deep sleep and engage in complex behavior including driving and cooking. They may have no recollection of what happened, or they may have some recollection as they go in and out between deep sleep and an awake state. Their actions are usually nonviolent, but they could be violent, and the person may not remember what they did during an episode. There is no objective test for sleepwalking. Dr. Aranas's diagnosis was based on criteria published by the American Academy of Sleep Medicine and the American Academy of Neurology for Sleepwalking. The criteria include (1) abnormal behavior that only arises from sleep, (2) performance of complex behavior, (3) disorientation while ambulatory, and (4) amnesia of some or most of the event. Dr. Aranas arrived at her diagnosis by applying these criteria to the clinical history Bliusovych provided to her. During Bliusovych's second appointment in June 2022, Dr. Aranas prescribed him two medications.

¶ 22    Dr. Aranas explained that someone who is sleepwalking "will be doing purposeful movements." They are "asleep in a sense," but go in and out of being in deep sleep and being awake. If someone who was sleepwalking was punched in the face and did not respond, then they were not conscious of what was happening. It would take two to three minutes for the person to wake from deep sleep. While someone is sleepwalking, they cannot comprehend the consequences of their actions.

¶ 23    Dr. Aranas saw Bliusovych for the third time in August 2022. Bliusovych reported that the frequency of his sleepwalking episodes had decreased.

¶ 24    Bliusovych's fourth and final appointment was in December 2022. For the first time, Bliusovych told Dr. Aranas that he had a sleepwalking episode in November 2021 that resulted in criminal charges. Bliusovych stated that on the night of the incident, he had been out with friends and slept at his friend's apartment. He fell asleep but remembered an open door in the neighbor's apartment across the hall. The next thing he recalled was lying on the floor with a man holding an object, ready to hit him. Bliusovych said he felt threatened and tried to flee, but the man pulled him back. The next thing Bliusovych remembered was the police being in the apartment. Bliusovych's story confirmed Dr. Aranas's diagnosis, and his recollection going in and out was typical for someone who was sleepwalking.

¶ 25    Defense counsel asked Dr. Aranas for her medical opinion of whether Bliusovych was sleepwalking during the November 2021 incident. The State objected, arguing that Dr. Aranas was not qualified or tendered as an expert witness and, therefore, could not give her opinion of Bliusovych's state of mind at a time before she knew him. The trial court ruled that Dr. Aranas

had "no way of testifying" whether Bliusovych was sleepwalking at the time of the incident and sustained the State's objection.

¶ 26    On cross-examination, Dr. Aranas acknowledged that her diagnosis was based on the clinical history Bliusovych provided to her and her physical exam. She did not confirm that the history Bliusovych provided to her was true. She did not review his prior medical records or speak with his wife or friends. She did not review the police reports in this case or Bliusovych's videotaped statements to police. As far as she knew, she was the first neurologist or sleep specialist Bliusovych had ever seen. On the same day as Bliusovych's final appointment in December 2022, Dr. Aranas spoke with defense counsel about testifying in this case.

¶ 27    Dr. Aranas explained that a person's recollection is taken "with a grain of salt" because their long-term and short-term memory can comingle, especially if a year has passed. Dr. Aranas stated that she "could care less about the details" of what happened during the incident. Instead, she was focused on Bliusovych's memory lapses between his recollections, which she found to be "a perfect example of sleepwalking." Bliusovych told Dr. Aranas that on the night of the incident, he was sleepwalking, walked out of his friend's apartment, and opened the neighbor's unlocked door across the hallway. Bliusovych recalled that his friend's neighbor hit him. Dr. Aranas also noted, "[t]he patient recalls regaining consciousness, laying on the floor barefoot." Bliusovych also recalled that a man holding a large object was about to hit him. Bliusovych explained that he did not know what was happening and tried to escape, but the man pulled him back inside the apartment and they engaged in a physical altercation. Bliusovych also recalled seeing a scratch on the man's neck. Dr. Aranas acknowledged it was possible Bliusovych was not completely forthcoming about what he did and did not remember. Dr. Aranas stated that before she took the

stand, Bliusovych informed her that he had sleepwalked the night before trial and could not remember anything that happened.

¶ 28 Dr. Ahmer Ali, a neurologist certified in sleep medicine, testified as an expert for Bliusovych. Dr. Ali testified that when someone is sleepwalking, parts of their brain are awake while other parts are asleep. Both the motor cortex, which controls physical movements, and the limbic system, which is involved with emotional responses, are awake. However, the frontal lobe—which involves reasoning, judgment, and impulse control—and the hippocampus, which controls memory, remain asleep. Many reported cases of sleepwalking involve violent behavior. In 90% of those cases, the person sleepwalking was provoked. Someone who is sleepwalking is not alert or in a "knowing state" and cannot make conscious decisions, but they may have a "limited recollection" of the sleepwalking incident.

¶ 29 Dr. Ali did not personally know Bliusovych. Rather, he reviewed Dr. Aranas's medical records, the police reports, and the body camera videos from the police officers who went to Shorter's residence on the night of the incident. Dr. Ali opined, with a reasonable degree of medical certainty, that Bliusovych had a sleepwalking disorder, was sleepwalking at the time of the incident, and was not consciously aware of his conduct. Dr. Ali noted that the witnesses described Bliusovych as looking confused and not responding, and that Shorter physically provoked Bliusovych, which resulted in violent behavior. It takes several minutes for a person to regain alertness and consciousness after a sleepwalking incident. Dr. Ali saw nothing in the police reports that indicated Bliusovych was either alert or intoxicated.

¶ 30 On cross-examination, Dr. Ali acknowledged that Bliusovych was not depicted in the body camera videos and was not present in Shorter's apartment when the police arrived. Dr. Ali neither

listened to the 911 call nor viewed either of Bliusovych's two videotaped statements to police. Dr. Ali did not speak with any witnesses involved with the case. Dr. Ali acknowledged that in his report, he wrote that Bliusovych and Shorter both entered the bathroom, Shorter slipped in the bathroom, and Bliusovych placed Shorter in a chokehold in the bathroom. Dr. Ali testified that, if he learned that he had not accurately interpreted the facts of the case, it would not change his opinion that Bliusovych was sleepwalking.

¶ 31    When Dr. Ali wrote his report, he did not know about Bliusovych's final appointment with Dr. Aranas and had not reviewed her records from that appointment. Dr. Ali never met or spoke with Dr. Aranas. Nor had he met or spoken with Bliusovych prior to writing his report. Dr. Ali never personally examined Bliusovych and never reviewed any of Bliusovych's other medical records. Dr. Ali had diagnosed more than 100 people with sleepwalking. He had personally interviewed and physically examined each of them and reviewed any available medical records. Dr. Ali acknowledged that he was not familiar with Bliusovych's typical behavior. He opined, however, that Bliusovych's behavior on the night of the incident could only be explained as sleepwalking.

¶ 32    In rebuttal, the State recalled Detective Trejo. On January 10, 2022, Trejo and his partner, Detective Napoleon, interviewed Bliusovych at his home and recorded their meeting on the officers' body cameras. Bliusovych told the officers that a friend may have had his vehicle on the night in question but that, at the moment, his vehicle was in the shop. On the night in question, Bliusovych went to a restaurant with family and friends and became intoxicated. Bliusovych did not tell the officers that he had a sleepwalking disorder. The interview lasted approximately 30 minutes. The State played the video of the interview in court, and it was admitted into evidence.

¶ 33    After interviewing Bliusovych, Trejo interviewed two of Bliusovych's friends. Thereafter, on January 20, 2022, Trejo arrested Bliusovych at his residence. At the police station, after advising Bliusovych of his *Miranda* rights, Trejo interviewed Bliusovych for about 25 minutes. This interview was recorded, and the State admitted the recording into evidence but did not publish it to the jury. Trejo testified that their conversation was very similar to the January 10 interview. Again, Bliusovych did not mention having a sleepwalking disorder.

¶ 34    On cross-examination, Trejo acknowledged that Bliusovych stated he did not harm anyone and that he was incapable of harming anyone due to his condition.

¶ 35    During closing argument, defense counsel told the jury that Bliusovych was not challenging Shorter's injury or the fact that Bliusovych caused it. Instead, Bliusovych was challenging the idea that he committed any of his acts knowingly, voluntarily, or intentionally. Counsel argued that the evidence showed Bliusovych was sleepwalking, and the State did not present any evidence that he was not. The State argued that the evidence demonstrated Bliusovych was consciously aware of what he was doing and was not sleepwalking, regardless of his diagnosis eight months later. The State asserted that Bliusovych's acts were intentional and deliberate, and if he had been sleepwalking, he would not have fled from the apartment or fled from Shorter the next morning.

¶ 36    During deliberations, the jury asked the trial court, "[t]o the question of knowingly or voluntary, does the prosecution have to prove beyond a reasonable doubt [Bliusovych] does not have parasomnia or does the defense have to prove the condition?" After consulting with the parties, the court replied, "[t]he burden is on the State to prove [Bliusovych] acted knowingly and voluntarily. [Bliusovych] is not required to prove his innocence."

¶ 37    The jury found Bliusovych guilty of home invasion and aggravated battery.

¶ 38    Bliusovych subsequently filed both a motion for a new trial and a motion for judgment notwithstanding the verdict (*n.o.v.*). In his motion for judgment *n.o.v.*, Bliusovych argued the evidence did not support the jury's verdict because it did not prove that he acted knowingly and voluntarily. Bliusovych further argued that the jury's rejection of Dr. Ali's and Dr. Aranas's unrebutted testimonies was arbitrary and against the manifest weight of the evidence.

¶ 39    The trial court found there was sufficient evidence that directly contradicted Bliusovych's sleepwalking defense and could have led the jury to reject his defense and the doctors' testimonies. Further, the jury could have found a lack of evidence supporting Dr. Aranas's diagnosis, as it was based upon Bliusovych's self-reported medical history. The court pointed out that the biggest consideration for the jury may have been that Bliusovych claimed he had a sleepwalking condition for nearly a decade but never sought treatment until after he was charged in this case. In addition, he did not inform Dr. Aranas about the instant alleged sleepwalking incident until his fourth visit with her. The court stated, "the key thing here is that the jury didn't have to accept the defense's theory of the case."

¶ 40    The court noted that an offender's actions demonstrate intent and knowledge. Also, a fact finder could find it difficult to believe that Bliusovych did not wake up when a man of Shorter's size punched him in the face. Moreover, the evidence demonstrated that Bliusovych fled when he saw Shorter later that morning, which could have led the fact finder to infer that Bliusovych did in fact recall the event. Accordingly, the trial court denied Bliusovych's posttrial motions.

¶ 41    The trial court sentenced Bliusovych to concurrent prison terms of nine years for home invasion and three years for aggravated battery.

¶ 42                                    II. ANALYSIS

¶ 43    On appeal, Bliusovych contends the trial court erred when it denied his posttrial motion for judgment *n.o.v.* because the State failed to prove him guilty beyond a reasonable doubt. Bliusovych claims there was no evidence that he knowingly and voluntarily committed the offenses where Dr. Ali testified that he was sleepwalking at the time and was not consciously aware of his conduct. Bliusovych also argues that the jury's rejection of Dr. Aranas's and Dr. Ali's unimpeached testimonies was arbitrary and against the manifest weight of the evidence. He asserts that there was no rational explanation as to why he entered Shorter's apartment other than the conclusion that he was sleepwalking, and that the jury was bound to accept the proffered medical opinion.

¶ 44    The State responds that the evidence proved Bliusovych guilty beyond a reasonable doubt where it was sufficient for the jury to infer that he was conscious and aware at the time of the offenses. The State argues that Bliusovych cannot show that the jury's verdict was against the manifest weight of the evidence where the evidence undermined the credibility of both doctors' diagnoses. The State further contends the jury was not required to accept the doctors' testimonies and chose to reject Bliusovych's sleepwalking theory. The State also asserts that Bliusovych is improperly claiming he had a diminished capacity, which is not a recognized defense in Illinois.

¶ 45    As a threshold matter, we note that the record on appeal does not include the exhibits admitted at trial—the recording of Brown's 911 call; Detective Trejo's body camera video of his interview with Bliusovych at Bliusovych's residence on January 10, 2022; the body camera video of a police officer speaking with Brown on the night of the incident; and several photographs depicting Shorter's condominium and injuries, and the rear of Bliusovych's vehicle. As the appellant, it was Bliusovych's burden to submit a sufficiently complete record of the trial

proceedings to support his claims of error, and any doubts arising from an incomplete record will be resolved against him. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 46    Initially, we find it necessary to clarify the issue and standards on appeal. Bliusovych has presented a convoluted argument that mistakenly intertwines unrelated standards. Bliusovych posits that the trial court erred in denying his motion for judgment *n.o.v.* because the State failed to prove him guilty beyond a reasonable doubt. Bliusovych correctly states that when reviewing a trial court's ruling on a motion for judgment *n.o.v.*, our standard of review is *de novo*. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37.

¶ 47    However, a substantial portion of Bliusovych's argument asserts that the jury's verdict was against the manifest weight of the evidence because it arbitrarily rejected the doctors' testimonies. In *Maple v. Gustafson*, 151 Ill. 2d 445 (1992), our supreme court clarified that this standard is used by the trial court "in determining whether to grant a *new trial*," not when determining whether to enter a judgment *n.o.v.* (Emphasis in original.) *Id.* at 455. Furthermore, a trial court's ruling on a motion for a new trial is reviewed for an abuse of discretion, rather than *de novo*. *Id.*

¶ 48    Finally, we note that in the conclusion section of his brief, Bliusovych argues the appropriate standard on review is reasonable doubt, and he conclusively asserts that the State failed to meet this standard.

¶ 49    In response, the State correctly notes that a ruling on a motion for judgment *n.o.v.* is reviewed *de novo*. However, the State asserts that Bliusovych's motion was the "functional equivalent" of challenging the sufficiency of the evidence. Hence, the State argues that we should apply the reasonable doubt standard and consider whether, when viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the

offenses were proven beyond a reasonable doubt. *People v. McLaurin*, 2020 IL 124563, ¶ 22 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 50    We consider Bliusovych's stated issue—challenging the trial court's denial of his motion for judgment *n.o.v.*—under *de novo* review. *Lawlor*, 2012 IL 112530, ¶ 37. The Code of Criminal Procedure of 1963 does not explicitly address a judgment *n.o.v.*, but it does provide for both a directed verdict and a posttrial motion for a new trial. *People v. Van Cleve*, 89 Ill. 2d 298, 303 (1982); 725 ILCS 5/116-1 (West 2022). "An order directing a verdict and a judgment notwithstanding the verdict are in substance the same, because they provide the same relief and are applicable on the same insufficiency-of-evidence ground." *Van Cleve*, 89 Ill. 2d at 303.

¶ 51    A motion for judgment *n.o.v.* should be granted " 'only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand.' " *Harris v. Thompson*, 2012 IL 112525, ¶ 15 (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). Our supreme court explained:

> "In other words, a motion for judgment *n.o.v.* presents a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case. [Citation.] The standard for entry of judgment *n.o.v.* is a high one and is not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. [Citation.]" (Internal quotation marks omitted.) *Lawlor*, 2012 IL 112530, ¶ 37.

¶ 52 A motion for a directed verdict and a motion for judgment *n.o.v.* "raise the same questions and are governed by the same rules of law." *Id.* When ruling on a motion for judgment *n.o.v.*, the court does not weigh the evidence anew or determine the credibility of the witnesses but, instead, only considers the evidence, and any inferences drawn therefrom, in the light most favorable to the opposing party. *Maple*, 151 Ill. 2d at 453. Under our *de novo* review, we apply the same *Pedrick* standard applied by the trial court. *Harris*, 2012 IL 112525, ¶ 15. "Most importantly, a judgment *n.o.v.* may not be granted merely because a verdict is against the manifest weight of the evidence." *Maple*, 151 Ill. 2d at 453.

¶ 53 To prove Bliusovych guilty of home invasion as charged in this case, the State had to show that Bliusovych, not being a peace officer acting in the line of duty, without authority, knowingly entered Shorter's dwelling and remained therein until he knew or had reason to know that one or more persons were present, and he intentionally injured Shorter therein, by grabbing him and striking him about the body. 720 ILCS 5/19-6(a)(2) (West 2020). To prove Bliusovych guilty of aggravated battery, the State had to show that, in committing a battery, Bliusovych strangled Shorter by grabbing him about the neck, impeding his normal course of breathing. 720 ILCS 5/12-3.05(a)(5) (West 2020). A person commits battery when he knowingly, without legal justification, by any means, causes bodily harm to an individual or makes physical contact of an insulting or provoking nature with an individual. 720 ILCS 5/12-3 (West 2020).

¶ 54 Here, and at trial, the only element of the offenses challenged by Bliusovych is whether he committed the offenses "knowingly" and "intentionally." A person acts "with knowledge of the nature or attendant circumstances of [their] conduct, described by the statute defining the offense, when [they are] consciously aware that [their] conduct is of that nature or that those circumstances

exist." 720 ILCS 5/4-5(a) (West 2020). Due to its very nature, knowledge is usually proven by circumstantial evidence, and thus, may be inferred from the facts and circumstances in the case. *People v. Slabon*, 2018 IL App (1st) 150149, ¶ 35. Whether Bliusovych acted with knowledge was a factual question for the jury to decide. *People v. Jones*, 2023 IL 127810, ¶ 27.

¶ 55 A person acts intentionally when their conscious objective or purpose is to accomplish the result or engage in the conduct described by the statute defining the offense. 720 ILCS 5/4-4 (West 2020). Similar to knowledge, intent is usually proven by circumstantial evidence and inferred from the surrounding circumstances in the case. *People v. Maggette*, 195 Ill. 2d 336, 354 (2001). Whether Bliusovych acted with the requisite intent is also determined by the trier of fact. *Id.*

¶ 56 Viewing the evidence in the light most favorable to the State, the record reveals that the evidence did not so overwhelmingly favor Bliusovych such that the jury's guilty verdicts could never stand. *Harris*, 2012 IL 112525, ¶ 15. The record reveals that the evidence was sufficient for the jury to find that Bliusovych acted with the requisite intent for home invasion when he knowingly entered Shorter's condominium and remained therein even after encountering Shorter. Shorter testified that within moments of discovering Bliusovych in his living room, Shorter punched Bliusovych in the face, knocking him down onto the couch. It is not inconceivable that a rational fact finder could find it hard to believe that, even if Bliusovych was initially sleepwalking when he entered Shorter's condominium, he did not awake when punched in the face. When making this same finding, the trial court took special note of Shorter's size. The jury and the trial court were able to make such observations, as is their purview. *People v. Vega*, 2018 IL App (1st) 160619, ¶ 44 ("we will not substitute our own judgment for the trier of fact on issues regarding the weight of the evidence or the credibility of the witnesses.").

¶ 57     If the jury concluded Bliusovych would have awoken and become alert at that point, then it could easily infer that Bliusovych committed every act thereafter knowingly and intentionally. This includes Bliusovych's refusal to leave the condominium after Shorter repeatedly demanded that he do so, all while pointing at the rear door. The jury could further find that Bliusovych's acts of rolling up his sleeves and turning his watch upside down indicated that he knowingly and intentionally prepared himself to attack Shorter. The evidence demonstrated that Bliusovych made fists with both of his hands, thrust them down at his sides while yelling, and lunged into Shorter's chest with his shoulder. These acts also support an inference that Bliusovych knowingly and intentionally attacked Shorter.

¶ 58     Shorter testified that Bliusovych made a quick "maneuver" and immediately placed Shorter in a chokehold using his forearms. As Shorter tried to pull away, Bliusovych gripped "tighter and tighter" around his neck until Shorter could no longer breathe and nearly lost consciousness. A rational jury could conclude from these circumstances that Bliusovych acted knowingly and intentionally when he committed the aggravated battery. Moreover, the evidence demonstrated that Bliusovych fled from both Shorter's condominium that night and the parking lot later that morning, upon seeing Shorter. The jury could have inferred that Bliusovych's acts of fleeing indicated that he was fully aware of what he had done to Shorter a few hours earlier.

¶ 59     In addition, the record supports that it is not unfathomable that the jury could reject the doctors' testimonies as not credible. Bliusovych claimed he had a sleepwalking disorder for many years but never sought medical care until six months after he was charged with the instant offenses. Dr. Aranas testified that Bliusovych came to her because he "wanted a diagnosis." A jury could find Bliusovych's timing and purpose in consulting Dr. Aranas highly suspicious. Adding to that,

the evidence demonstrated that Bliusovych did not mention the instant alleged sleepwalking incident to Dr. Aranas until his fourth and final appointment with her, six months after he began seeking her help. Coincidently, that same day, defense counsel spoke with Dr. Aranas about testifying in this case. In light of these circumstances, it is foreseeable that a jury could find Dr. Aranas's testimony incredible.

¶ 60     The record further supports that the jury could have faulted Dr. Ali's testimony. Dr. Ali testified that he did not know Bliusovych, never personally examined him, and had not spoken with him prior to writing his report. Nonetheless, Dr. Ali opined that Bliusovych was sleepwalking at the time of this incident. Dr. Ali based his opinion on his review of Dr. Aranas's medical notes from her first three appointments with Bliusovych, the police reports, and the body camera videos from the police officers who went to Shorter's residence on the night of the incident.

¶ 61     Dr. Ali admitted that when he wrote his report, he did not know about Bliusovych's final appointment with Dr. Aranas and never reviewed her records from that appointment. Dr. Ali never met or spoke with Dr. Aranas. He did not speak with any witnesses involved in the case. He did not listen to Brown's 911 call or view either of the two videotaped statements in which Bliusovych discussed what he did that night. The record indicates that Dr. Ali wrote in his report that Shorter slipped in the bathroom and that the chokehold occurred in the bathroom, which was not an accurate reflection of the facts. Yet, Dr. Ali testified that even if he had inaccurately interpreted the facts of the case, he would not change his opinion that Bliusovych was sleepwalking during the incident. Based on this evidence, a jury could rationally reject Bliusovych's theory that he was sleepwalking at the time of the incident.

¶ 62 After reviewing all evidence presented at trial, together with all the reasonable inferences that can be drawn from the evidence in the light most favorable to the State, we conclude that Bliusovych has not satisfied the high standard required for entry of judgment *n.o.v. Lawlor*, 2012 IL 112530, ¶ 37. Accordingly, we find that the trial court did not err in denying Bliusovych's motion for judgment *n.o.v.*

¶ 63 To the extent Bliusovych is attempting to challenge the trial court's denial of his motion for a new trial by arguing that the jury's verdict was against the manifest weight of the evidence, we find no error. It is well-settled that the trier of fact is not required to accept an expert witness's opinion. *People v. Terrell*, 185 Ill. 2d 467, 496-97 (1998). As discussed above, there were many factors and inferences which could have led the jury to reasonably determine that the testimonies of Dr. Aranas and Dr. Ali were not credible. The record demonstrates that, in denying Bliusovych's motion for a new trial, the trial court discussed detailed facts from the case and found there was sufficient evidence that directly contradicted Bliusovych's sleepwalking defense and could have led the jury to reject both his defense and the doctors' testimonies. Consequently, we find the trial court did not abuse its discretion in denying Bliusovych's motion for a new trial. *Maple*, 151 Ill. 2d at 455.

¶ 64 Finally, we find the State's assertion that Bliusovych improperly presented a "diminished capacity" defense forfeited because it was not raised in the trial court. It is well-settled that issues or arguments not raised in the trial court are generally forfeited on appeal. *People v. O'Neal*, 104 Ill. 2d 399, 407 (1984). The rule of forfeiture applies to the State as well as the defendant. *Id.*

¶ 65                                         III. CONCLUSION

¶ 66 For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 67    Affirmed.